# CASES

# IN THE SUPREME COURT

OF THE

## TERRITORY OF WYOMING.

MARCH TERM, 1878.—(OMITTED IN VOL. 1.)

---

### MOORE v. THE BOARD OF COUNTY COMMISSIONERS OF SWEETWATER COUNTY.

TAXATION.—The territory has no right to tax the property of a post trader at a military post situated upon an Indian reservation, and the tax if paid can be recovered back.

IDEM.—It is immaterial that such trader furnished the lists and valuations on which the taxes were levied; the right to impose a tax, and as preliminary to it to take a list and valuation of the property intended to be taxed, depends not upon the consent of the party taxed, but upon the power of the government which assumes to exercise the right, and upon the functions of the officers through whom it assumes to exercise it. The territory is totally excluded from the exercise of political power over the Indian country, either to regulate the intercourse of its subjects with it, or to extend its municipal authority into it.

ERROR to the District Court of Sweetwater County.

The case was submitted to the court below upon the following agreed statement of facts:

"It is hereby agreed and stipulated by and between the parties plaintiff and defendant hereto, that said cause shall be heard, tried and determined by the court without the intervention of a jury, upon the following agreed statement of facts; it being agreed further between the parties hereto, that the following are the facts and all the facts of this case: This action is brought to recover moneys paid by the plaintiff to the collector of taxes for said county of

Sweetwater for the years 1873, 1874 and 1875 respectively, as taxes regularly assessed against the said plaintiff for poll and property taxes for said years respectively. It is admitted that said taxes were paid by said plaintiff under protest; and that said taxes were regularly assessed and levied and were payable to said collector for said years respectively, unless by reason of the residence of said plaintiff and the location of the property assessed the law did not authorize the public authorities in said territory to collect the same from the said plaintiff.

It is further admitted that at the time of the assessment, levy and payment of all said taxes, said plaintiff resided upon a regularly established military reservation of the United States of America, and that such military reservation was at all of said times within the territorial limits of Sweetwater county, and was also at all of said times within and surrounded by a regularly established Indian reservation, known as the Shoshone and Bannock Indian Reservation. It is further admitted that the amount of such taxes received from said plaintiff were as follows: For 1873, $116.39; for 1874, $93.42; for 1875, $232.25. It is further admitted, that for the year 1874 said plaintiff was assessed upon property as follows: Merchandise, $2,000; 4 horses, $350; 67 cattle, $3,120; 10 wagons, $550; other property, $75; total, $6,095. That at the time the assessment for said year 1874 was made, all of said property was within the geographical limits of said Sweetwater county, and that said merchandise was upon said military reservation in a storehouse owned by said plaintiff, where plaintiff was engaged in selling goods as a merchant; that said horses, cattle, and wagons were at that time within said county and were being used as a train by said plaintiff, for the purpose of freighting goods from the Union Pacific Railroad in said county, at points thereon not on either said military or Indian reservation, to said military reservation and across portions of said country and portions of said Indian reservation; that the amount and kinds of said property owned

by said plaintiff in the year 1874 were furnished to the assessors of said county by said plaintiff.

And it is further admitted that for the year 1875, said plaintiff was assessed upon property as follows: buildings $500, merchandise 3,500, 5 horses $250, 575 neat cattle $10,350, 12 wagons $550, other property $200, total, $15,350. That at the time the assessment for said year 1875 was made, all of said property last described was within the geographical limits of said Sweetwater county, and that said merchandise was upon said military reservation in a storehouse owned by said plaintiff, where plaintiff was engaged in selling said goods as a merchant, that said horses, wagons, and 75 head of neat cattle were within said county and were being used as a freighting train by said plaintiff for the purpose of freighting goods from the Union Pacific Railroad in said county at points thereon not on either of said reservations, and across portions of said county and Indian reservation; that 500 head of said neat cattle were at that time kept by said plaintiff as a stock-grower or stock-raiser for gain and profit, and were for the most part kept by said plaintiff upon said military reservation, but were at times allowed to graze and subsist upon said Indian reservation, and at times not upon either said reservations but within said county. That the amount and kinds of the property last described and owned by said plaintiff in the year 1875, were furnished to the assessor of said county by said plaintiff; said building was, when assessed, owned by said plaintiff and was situated on said military reservation.

It is further admitted that for the year 1873 said plaintiff was assessed upon property as follows: merchandise $3,000, 4 horses $350; 70 cattle $3,300; 12 wagons $600; other property $509—total $7,759. That at the time the assessment for the year 1873 was made, all of said property was within the geographical limits of said Sweetwater county, and the said merchandise was upon said military reservation in a storehouse owned by said plaintiff, where he was engaged in selling said goods as a merchant; that said horses,

cattle, and wagons were at the time within said county, and were being used as a freighting train by said plaintiff for the purpose of freighting goods from the Union Pacific Railroad at points thereon not in said military or Indian reservation, to said military reservation and across portions of said county and portions of said Indian reservation; that the amount and kinds of said property were furnished to the assessor of said county for the year 1873 as property owned by said plaintiff. It is further admitted as a fact, that portions of the taxes aforesaid, paid by said plaintiff, were poll taxes, and portions were territorial taxes, and portions were for the county school fund of said county, and that all of said territorial taxes were paid to the treasurer of said territory before the commencement of this action by the treasurer of said county; that all of said taxes belonging to the county school fund of said county, were paid out and delivered to the several school districts of said county before the commencement of this action, the same having been duly apportioned to said districts.

It is also admitted that before the commencement of this action all of said taxes had been paid to the treasurer of said county.

It is also admitted as a fact that the amount of poll tax, territorial tax, and taxes belonging to the different funds of said county, and paid by plaintiff as aforesaid, are correctly shown by the memoranda upon the margin of three exhibits attached hereto and made a part hereof and marked " A," " B," and " C " respectively, and that the said exhibits are the tax receipts for said taxes given to said plaintiff for said taxes for the years 1873, 1874, and 1875; and that exhibit " A " is the tax receipt of plaintiff for the year 1873, exhibit " B " is the tax receipt given to said plaintiff for the said taxes for the year 1874, and that exhibit " C " is the tax receipt given to said plaintiff for said taxes for the year 1875.

It is further admitted as a fact that .during the years aforesaid said plaintiff was the regular post trader at said

military reservation, duly appointed by the United States, and that during the same time he was duly licensed as an Indian trader to trade with the Indians to whom said Indian reservation belonged: and that said plaintiff during the same time sold goods from his store, upon said military reservation, to people not residing on either of said reservations nor connected therewith, as well as to persons in the military reservation of the United States, or connected with or residing upon said Indian reservation. At the time all of the property aforesaid was assessed to the same plaintiff, it was all within the limits of Sweetwater county, as said limits were established by the legislature of Wyoming Territory; and that said plaintiff claimed to and did exercise the right of suffrage in said county during the years said taxes were assessed to him.

It is further admitted as a fact that said military reservation, upon which said plaintiff resided as aforesaid, was regularly established by the United States prior to the year 1873, and subsequent to the ratification of the treaty establishing the Shoshone and Bannock Indian Reservation aforesaid, and out of lands which had theretofore constituted part of the Indian reservation; and that said military reservation was created in the same manner as other military reservations created by, and under the authority of, the United States.

Upon the above statement of facts, the question submitted to the court for its determination is: Can the said plaintiff in this action recover the whole or any portion of the said taxes paid as aforesaid by the plaintiff, from the defendant, and if so what portion of the same can plaintiff recover in this action.

E. P. JOHNSON,
Attorney for plaintiff.
W. W. CORLETT,
Attorney for defendant.

The district court found in favor of the defendant, and rendered judgment against the plaintiff for costs.

*Johnson & Potter*, for plaintiff in error.

*W. R. Steele*, for defendant in error.

PECK, J.   The questions, presented for our considera-
tion, are raised by the pleadings and the agreed statement
of facts, (which latter was filed on May 4th, 1877, in the
district court,) to avoid the prolixity of re-statement, our
opinion is formed with reference to an abstract of the
pleadings and to the agreed facts as accompanying it, and
therefore in the assumption and trust that they will be
inserted by the reporter, the pleadings by abstract, and the
agreement *verbatim* in the reported statement of facts for
the correct understanding of the decision.

 · The taxes in question were collected under the statute of
December 10, 1869, entitled, "An act to provide a Territo-
rial and County Revenue," Compiled Laws, 549.   The act
was amended by the two statutes of December 16th, 1871,
and December 11th, 1875; but in particulars which do not
affect the question.   Section 1 of the original act declares
that there shall be annually levied and assessed upon the
taxable real and personal property within the territory, ter-
ritorial and county taxes, and a poll tax for school pur-
poses; section 2d specifies what property shall be exempted,
but does not embrace any of that on which the taxes in
question were collected; section 3d declares that *all other
property, real and personal, within this territory, is subject
to taxation,* in the manner prescribed in the act; all the
other sections relating to the listing assessment, levy and
collection, either in terms or by clear implication, contem-
plate the taxing of *all property within the territory except*
such as is exempted by section 2d; provision is made for
taking an annual poll list or census for the poll tax; per-
sonal taxes are enforcable by warrant, distress and sale, and
the use of the *posse comitatus;* lands may be sold for taxes,
and tax-titles passed to the purchaser by certificate and
deed.   If this statute is to operate according to its intent,

the taxes in question were, upon the facts, which are before us, lawfully collected; otherwise, not.

The right to impose a tax, and, as preliminary to it, to take a list and valuation of the property intended to be taxed, depends not upon the consent of the party taxed, but upon the power of the government, which assumes to exercise the right, and upon the functions of the officers, through whom it assumes to exercise it. Hence the fact that Moore furnished the lists and valuations, on which the taxes were levied and collected, conferred no power, not independently existing, nor was necessary to a power already existing, and is therefore immaterial. His furnishing the lists and valuations were the ordinary acts of a party threatened with taxation and desirous to avoid forcible proceedings to obtain them. The act of December 10, 1869, subjected him to penalties for refusal to permit them. The matter stands therefore, precisely as it would have stood, had the lists and valuations been compulsorily taken; and Moore stands as an involuntary party in respect to them. His payments of the taxes rest upon the same consideration. If enforced collections of them would have been illegal for want of power to tax, the unenforced collections were not legal, and the protests which accompanied the payments, were unnecessary to the preservation of his rights.

The British crown established its limits upon this continent under a principle, recognized between it and other civilized governments, and which became fixed in public law, that the jurisdiction of the crown was within those limits exclusive of all other nationalities, except the Indian nations or tribes, which were located within those limits; that the soil therein belonged exclusively to such Indian nations or tribes, except so far as the crown should acquire it from them by cession, purchase and lawful conquest; that, as an incident to the ownership of the soil, the separate dominion and sovereignty of the soil belonged to them; that they were independent political communities, nations

and governments: but that their sovereignty was so far qualified, that they could part with the titles to the soil, and its incidental dominion and sovereignty to the crown alone, that they could not hold political relations with communities, which were outside of those limits, or with each other; that they were entitled to the protection of the crown against such foreign nations, against each other, and against its subjects; and so far were dependent upon the crown.

This principle, never abandoned by the colonies after they declared their independence, was fully incorporated into the federal constitution, which confers on the United States the exclusive power to make treaties, and to regulate commerce with foreign nations and the Indian tribes.   The expressions " *to regulate commerce,*" " *nations,*" " *tribes,*" had become definite, fixed, and technical, before the constitution was adopted; to make treaties, and to regulate commerce, are things predicable only of relation and action between sovereignties; are not and have never been predicated of relation or action between a government and its subjects: the terms, " *nations,*" " *tribes,*" are identical, so far as they express a sovereign status; and it is clear that these terms, so identical in public law and in the government dealings with the tribes prior to the constitution, are employed by that instrument in accordance with the original principle, which treated nations who were without, and Indian tribes, which were within out limits, as sovereign, but the latter qualified by sovereign.   It is not open to reasonable doubt that, as the instrument was adopted after the tribal states had become defined and fixed, it intended to treat them according to that status.   Allowing that a tribe may dissolve itself, and its members become subjects of the United States, yet, as long as it sees fit to preserve its organization, it may do so.   It results that these tribes have territorial boundaries, separating them from the states and territories; that within those boundaries their authority is exclusive, except so far as they choose to relinquish it; that they own

all the interior lands, and in their uninterrupted use it is the duty of the government to secure them; that the United States have the exclusive power to deal with them, which they not only may, but must exercise, which therefore they can neither delegate, nor be deprived of; and that commonly the tribes can deal with no other political power than the United States, and may accept no authority but its. Consequently the states and territories are totally excluded from the exercise of political power over the Indian country, either to regulate the intercourse of its subjects with it, or to extend its municipal authority into it. This disposes of the claim of taxing power in favor of the plaintiff. In view however of the importance of the subject it is desirable to develop its consideration further.

Pursuing the constitution and a treaty of the United States with certain Indian tribes, which latter established a boundary between that government and those tribes, congress passed the act of March 30th 1802, 2 U. S. S. at L. 139, which recognized that line, and provided for the regulation of trade and commerce with those tribes, and the preservation of peace on the frontier; also the amendatory act of May 6th, 1834, 3 Ib., 628: the boundary having been changed by intermediate treaties, congress passed the act of June 30th, 1834, 4 Ib., 729, which recognized the boundary as so defined, and provided for the regulation of trade and intercourse with the Indians, and the preservation of peace on the frontier; also the amendatory act of March 15th, 1864, 13 Ib., 29. These statutes treat all the lands, lying beyond those lines, as owned by the tribes, and designate them as Indian territory or Indian country. By these and other acts the United States have assumed, under the constitution, the exclusive regulation of all commerce with the tribes, whether residing on reservations, located within states and territories, or on lands lying without them.

From the first the government has recognized, as facts, that the North American Indian has persistently resisted the attractions of civilization, and adhered to the savage

state, as his normal condition; that, saving a few and feeble exceptions, under civilistic influences and in contact with the civilized race he has rapidly deteriorated, been less governable, and has quickly disappeared; a state of nature has apparently been more favorable to his enjoyment, control and preservation; that it would be unlawful, impracticable and mischievous to attempt to impose on him the restraint of civilized life, or laws adapted only to a highly civilized condition; and equally unwise to induce him to abandon his separate state for that of its subjects: that, while the door of civilization should be open to him, he should not be forced to enter. The better to satisfy this complex status of sovereignty, dependence and wardship occupied by the tribes toward the government, and accomplish the paternal policy thus put upon it to render justice, and exercise humanity toward the Indian, and to secure protection for the subject, the government has adopted and maintained by treaty the reservation system; a system which secures the completest practical separation of the tribes from the subjects; and the former in the enjoyment of their independence, and of their native state, freely opens to them the door of civilization, supplies their wants, promotes the regulation of commerce with their country, and peace and order between them and the outside communities; a reservation being a tract or district of country, set apart for the exclusive occupation of the given tribes, as a community separated from and independent of the communities, people and governments, which may surround it, as those surrounding communities, people and governments, are separated from it: the treaties keeping faithfully to the idea of the constitution, and dealing with the tribes as distinct sovereignties. The federal government provides an Indian agent, and other officers and servants, whom it maintains upon the reservation, but only for reservation purposes. The treaties usually confer upon the government the right to legislate for the wants of the tribes, and in that connection to regulate its internal police, but only within

the limits of preserved tribal organization; and in pursuance of this power it locates upon the reservation an Indian trader, and a military reservation. Thus the government occupies the reservation with the tribe; but, as the reservation is based upon treaty, only for treaty purposes, it equally follows that its officers and servants, as maintained upon it, are there simply under its authority and for its purposes, and that whatever political or municipal status they have while there, must be necessary by the treaty; hence there is no room within the reservation for any other political or municipal power.

We are to presume that the Indian reservation, described in the agreed facts, is a reservation established and maintained under this system: that the plaintiff, described in the agreement as residing on it as an Indian trader and a post trader, was there during the period in question in those capacities, in virtue of a power conferred upon the government in the treaty, creating the reservation, to legislate for the wants of the tribe: we are also to presume that the general government has no power to enter upon it, except for reservation purposes, and that the political and municipal status of all its officers, agents and servants, who are located there in accordance. If the municipal power of the territory could tax the plaintiff in one particular, it could tax him in another; if it could tax his property, it could tax his poll; if it could tax his property, it could tax his official licenses: as the taxing power is unlimited, it could exhaust his assets. If that power could tax one party, placed, stationed or resident, upon the reservation under the treaty, it could tax any other party, so placed, stationed or resident there; every military officer, private soldier, other federal agent or servant, or Indian in respect to poll, property and industry. The taxing power stands upon a principle, which embraces all municipal authority. If that authority could extend itself over the reservation in one particular, it could extend itself over it in every other particular: it could carry over it its Sunday, its sumptuary, its sanitary, its militia,

and its police regulations : its entire civil and criminal juris-
diction.    To extend its laws, is to enforce them, for the two
things are impossible : to enforce them, all the machinery
of the territorial courts apply to those so within, as to those
who are without the reservation ; to enforce them, the origi-
nal, the mesne, the final process of the courts may be em-
ployed ; and to execute them, the *posse comitatus*, and, as a
part of it, the territorial militia may be sent into the reserva-
tion : the federal power must stand aside, and be as nothing.
The result is that the reservation becomes dependent upon
the irresponsible will of the territorial government, may be
broken up by it, is a mere fiction.    Such a power, because
its insatiable tendency would be to strip the tribe of its
reservation and its nationality, to usurp the status of the
general government towards the tribe, nullifying its power
over, and its duty towards it, we regard as utterly inadmis-
sible, whether the treaty does or does not assume to allow
it.    But what is this treaty ?    It was made on the 3d day of
July, 1868, with the eastern band of Shoshones and the Ban-
nock tribe of Indians, and ratified on the 16th day of Feb-
ruary, 1869.    The organic act of the territory was approved
on July 25, 1868 : it is subject to the treaty, because the
treaties of the United States control its statutes, because
the Constitution speaks its supremacy through the treaties :
and the clause in its first section, "that nothing in the act
shall be construed to impair the rights of person or property,
now pertaining to the Indians in the territory," is declara-
tory and superfluous.    Following the constitutional idea, it
fully answers to the threefold relations existing between the
government and the tribes.    It is entitled a treaty : it is
a treaty, not a law : it deals with them as independent
powers, not as subjects : its first and fundamental pro-
vision is for the existence of permanent peace between
the parties : throughout each deals with the other as equals
—as politically contracting parties.    It provides, that, if
any outside person, a subject of the United States, shall
commit injury to the person or property of an Indian,

that government will cause the offender to be punished according to its laws, and will reimburse the Indian for the loss, thus becoming responsible to the Indian for the conduct of its subjects: that, if the Indian commits injury to the person or property of such subject, it shall be remedied before the Indian Commissioner, and by a method of procedure and form of satisfaction, which are especially prescribed in the instrument: that the tribe shall occupy the reservation as its permanent home, and in common, but that individual members of it may, in a given mode, acquire lands within the reservation for farming purposes as exclusive owners and settlers, the lands, so settled, to stand as taken out of common: that the cession of no part of the reservation should thereafter be made except by treaty: and that the United States should have full power to legislate as to government of the Indians upon the reservation, including the internal police thereof, the alienation and descent of property between them, the protection of the rights of such as should settle upon lands for farming purposes, and the fixing of the character of the settler's titles. It requires the United States to maintain upon the reservation, mechanics of various crafts, also physicians and teachers, who are to reside upon it, together with corresponding mechanical improvements, also a school and mission house—all to promote the general purpose of a reservation: it also requires the government to maintain upon it an Indian agent, who shall reside there, and have the general care of the tribes. It appears by the agreement and is distinctly stated to us by the counsel on both sides that the military was a part of the general reservation, attached to it for the more efficient performance by the government of its treaty duties: hence it was simply an incident to the latter, and took its character from it; and was established, and the plaintiff, as Indian and post trader, located there under the legislative power conferred by the treaty. The instrument in effect reaches the mechanics, physicians, teachers, the Indian agent and the trader agents of the government upon the general reserva-

tion.   The second article, designating the limits, declares, " and the same is set apart for the absolute and undisturbed use and occupation of the Shoshones Indians, herein named, and for such other friendly tribes and Indians, as from time to time they may be willing, with the consent of the United States, to admit amongst them."   This absolute use and occupation can mean no less than a complete and exclusive, and thus an undisturbed use and occupation; but, if they are to be exposed to the municipal authority of a government, which is neither a party to the treaty, nor responsible for its obligation—and which is susceptible to indefinite expansion and changes within its organic law, an authority, which in such sense is unrestrained and irresponsible—that use and occupation is not absolute and undisturbed, but is altogether subjective, open to endless perturbations, shifting and uncertain in continuation; the article declares that " no person, except those designated in the treaty, and such officers, agents and employés of the general government, as may be authorized to enter upon it in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside within the reservation."   This article is of itself conclusive against the taxing claim.   The ruling purpose of the treaty is to secure to the tribes a separate country, wherein to maintain their sovereignty, and to govern themselves after their own laws, subject to relations with no power other than the United States, and those only which the instrument defines.   This idea reciprocally binds the parties : as the tribes can deal with no other political power than that government, so the latter can delegate no power; which the instrument confers upon it.   It places the tribes, as dependent sovereignties, under the protection of the government; and, to secure the protection, specifies certain provisions, and confers a general power of legislation.   The provision for peace, involving, as it does, the power to enforce it by arms, the other specific provisions, and the general provisions are intended to prescribe all the relations, that are to exist between the parties : while they prohibit no

Indian from being a suitor in a court without the reservation, nor exempt him from the service of the process of such court, when made upon him without the reservation, they are plainly intended to supply all the law, which is to operate within the reservation. · To open it to the municipal power, is to open it to the political power of the territory, from which the former emanates, and by which it is directed: which is to let that political power completely override the treaty.

It is clear that by the constitution, the acts of congress, and the treaty that the reservation, geographically within, is municipally without the territory of Wyoming; that the residents of the former are non-residents of the latter; consequently that neither the territory, nor any of its subordinate municipalities can have a taxing power within, because neither can send its taxing officers into the reservation. We should unhesitatingly have arrived at this conclusion, unaided by adjudication; but it is sustained by the cases of *Jackson* v. *Graham; Lapeer* v. *McIntosh*, 8 Whea., 573; *The American Fur Co.* v. *The United States*, 2 Pet., 358; *The Cherokee Nation* v. *Georgia*, 5 Pet., 1; *Wooster* v. *Georgia*, 6 Pet., 514; *United States* v. *Rogers*, 4 How., 570; *Fellows* v. *Blacksmith*, 19 How., 366; *United States* v. *Holliday*, 3 Wall., 409; *The Kansas Indians*, 5 Wall., 737; *The New York Indians*, 5 Wall., 767; *United States* v. *Forty-three Gallons of Whiskey*, 3 Otto, 188; *Bates* v. *Clark*, 5 Otto, 204. No principle could be more explicitly presented, or steadfastly maintained by any court, than this one has been by the supreme court of the United States. In *The United States* v. *Rogers*, Taney, C. J., delivering the opinion, said: "The native tribes, who were found on this continent at the time of its discovery, have never been acknowledged or treated as independent nations by the European governments, nor regarded as owners of the territory they respectively occupied. On the contrary the whole continent was divided and parcelled out by the governments of Europe, as if it had been vacant and unoc-

cupied land, and the Indians continually held to be, and treated as subjects to their dominion and control." This is the only hint of the kind in that court upon the subject.

This remark of the judge is in direct conflict with the principle, as recognized by the Crown, the United Colonies and the Confederation; in direct conflict with the constitution, statutes and treaties of the federal government, including its numerous treaties with the Cherokee Nation, under which it held its Georgia reservation; also its treaty of New Echota of 1830, 7 U. S. S., at section 478, with that nation, under which it accepted its Arkansas reservation, in lieu of its former one—the very treaty, which was under consideration in the case. So long as our government defines its dealings with the tribes by the terms " compacts," "treaty," "trade," "intercourse," "commerce," and the like, it is concluded from saying that those tribes do not own their unrelinquished soil, and with the soil its political incidents. The remark of the judge was also in direct conflict with the principle, on which the *Rogers* case was decided, and foreign to its point. The defendant was indicted under the 25th section of the statute of June 30th, 1834, for murder, as committed by him, a white man, upon another white man in the Cherokee Indian county in Arkansas: he plead to jurisdiction that, before the alleged murder he was a citizen of the United States, had renounced his allegiance to it, removed to the Cherokee country, and became a Cherokee Indian and a member of the Cherokee nation by incorporation into it,—and was such member and Indian, and, as such, domiciliated in that country, when the alleged offense was committed; and that the party, on whom it was committed, was in like manner then a member of that nation, a Cherokee Indian, and there domiciled. By this plea the case came before the supreme court of the United States. That court assumed the validity of the statute, held that the act conferred jurisdiction, and that the plea was bad. To treat the act as valid, was to recognize its principle. The plea, conceding the principle, sought

to take the case out of the operation of the 25th section, under its provision that it should "not extend to crimes committed by an Indian against the person or property of another Indian." The court very clearly held that the exception was confined to Indians, who were such by race, otherwise it would invite into the Indian country the very element of the whites, most calculated to promote discord, and to defeat the policy of the act. The court further held that a saving clause of the treaty of New Echota left the 25th section in full force. To recognize the proviso of the section, was to recognize a distinction between the relation to the United States of the Indians, and the relation to it of its subjects. To hold that the operation of the section was saved by the treaty, was to hold that its operation might have been cut off by the treaty—a thing impossible in law, unless the Cherokee nation was an independent contracting power; for, had the treaty cut off the section, it would have been because that action was reserving an exclusive right, not the United States relinquishing a supreme jurisdiction. The adjudications of that court are over imperative rule : but, to know what to obey, we must understand what has been decided: hence our necessity to discriminate, in the application of its opinions, between what it intends and what it does not, between decision and dictum. In *Wooster* v. *Georgia*, the Cherokees occupied a reservation, set apart for their separate use in that state by treaty between them and the United States. The entire treaty recognized the separate sovereignty of these Indians, and their dependence upon the general government in the senses which are explained above : declared that no persons should reside, or enter upon the reservation, but those designated in the treaty, and such others as the Indians might admit with the consent of that government: under that consent Wooster became a resident upon it, as an Indian missionary, and was so residing, and was there in that capacity, when indicted and arrested, as is hereinafter mentioned : On December 22, 1830, the state passed an act,

declaring that no white person should reside upon the reservation without a special permit issued by or under the governor of the state, and taking a prescribed oath to the state ; and provided for the stationing of guards within the reservation to arrest violators of the statute. Wooster was indicted in a Georgia court, arrested and convicted under the act, and sentenced to four years confinement in the state penitentiary. The supreme court of the United States decided that the Georgia statute was repugnant to the sovereignty and independence of the Cherokees, to the act of congress, to the treaties under which they held the reservation, and to the federal constitution, which operated through them, and made them exclusive and supreme : that the reservation was extra-territorial as to Georgia, and that its process could no more be executed in the reservation, than it could be in another state. Delivering the opinion, Chief Justice Marshall said : " The Cherokee nation then is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter but with the assent of the Cherokees themselves, or in conformity with treaties and with the acts of congress. The whole intercourse between the United States and the nation is your constitution and laws vested in the United States." He further said : " Had a judgment, liable to the same objections, been rendered for property, none would question the jurisdiction of this court. It cannot be less clear, when the judgment offsets personal liberty. The plaintiff in error is not less interested in the operation of this unconstitutional law, than if it affected his property. He is not less entitled to the protection of the constitution, laws and treaties of his country." The analogy suggested by this last remark is realized in the case now before us. The collection of the taxes from the plaintiff was in its form more narrow and mild, but in its principle just as scopeful, illegal and mischievous, as was the action of the Georgia court towards Wooster. This

territory repeated what the United States supreme court held to be inadmissible in a state. The three several cases of the Shawnees, Weas and Miamis reported under the title *The Kansas Indians*, the Shawnees occupied a reservation in Kansas under a treaty with the federal government of November 2nd, 1854, 10 U. S. S. at L., 1063, which was silent as to liability for taxes under state laws. The case came before the United States supreme court upon a claim of power by the state to tax lands belonging to the reservation. In its decision the court said that, if the tribal organization was preserved intact, the Shawnees were a people distinct from others, separated from the jurisdiction of Kansas, and under the protection of the constitution, the laws of congress and treaties ; and, until they were clothed with all the rights, and bound by all the duties of citizens of Kansas they enjoyed total immunity from taxation : the court held that the tribe had not abandoned its organization, and decided that, under the constitution, the power claimed by the state did not exist. The cases of the Wea and Miami tribes, which occupied several treaty reservations in Kansas, involved the same question, and were decided on the same principle. In the case of *The New York Indians* the court, following the principle of the Kansas Indians, decided that the attempt of the state of New York to tax the reservation lands, located in that state, and held by the Senecas under treaty, was unconstitutional. The defense has cited 1 Woolworth, 17, *United States* v. *Ward* ; Ib., 192, *United States* v. *Stahl*, in support of its claim to tax. As these two cases were read to us upon the argument, we could detect nothing in their decision, which was adverse to our views ; but we do not look into them to see whether they accord with, or differ from the other decisions, above referred to ; the decisions of an inferior court of the United States are not needed to sustain, and are not acceptable to overrule those of its supreme court. Both sides have cited state and territorial cases upon the subject ; but, when a given point has been adjudicated by our appellate court, it

would neither be decorous, nor permissible for us to consult state or territorial decisions relating to the point ; we therefore decline to do it in this instance, and allude to those citations, simply to dismiss them from consideration.

When listed, the laws of the property was the reservation. It is not clear by the agrement but is rather its import that it was then actually there ; but, whether all actually within the reservation, or apart temporarily beyond it and within the county at the time, is immaterial, because the *locus* governs.

Moores voting as a citizen of Wyoming is immaterial. If he had not the right to vote, his voting did not confer the the right, nor could confer the power to tax.

As the taxes were illegally collected, it follows that they must be restored by the county with interest from the several dates of collection, namely : $116.39 with interest from October 8, 1873, $93.43 with interest from September 25, 1874, $232.25 with interest from November 10, 1875. The judgment of the district court is reversed ; and it is directed to proceed with the case according to the opinion.

Judgment reversed.