POWDER RIVER CATTLE CO. v. BOARD OF
COUNTY COM'RS OF JOHNSON COUNTY.

(February 18, 1892.)

TAXATION FOR SCHOOL PURPOSES — LIMITATIONS—
ACTION TO RECOVER BACK—PARTIES — MUNICI-
PAL CORPORATIONS.

1. Taxes levied for the support of common
schools of the county are not taxes for "county
purposes, " within the meaning of Rev. St. § 3768,
which provides that county commissioners may
levy a tax for the support of common schools, not
to exceed three mills on the dollar, but that the
aggregate tax "for territorial and county pur-
poses" shall in no case exceed sixteen mills on
the dollar per annum, and are not to be consid-
ered in determining whether such tax is excessive.

2. Rev. St. § 3055, provides that actions to
recover back taxes must be brought against the
officer who made the collection, or his personal
representative, with a proviso that when the
money derived from such taxes has been paid over
to a municipal corporation for whose use and
benefit it was levied, then the action shall be
brought against such corporation. *Held*, in an
action to recover back an illegal county tax, that
the term "municipal corporation" does not in-
clude counties, and that the action should have
been brought against the county treasurer, as
collector, and not the county.

CONAWAY, J., dissenting.

ON REHEARING.

1. In an action to recover back taxes, the
tax collector and not the county must be sued.

2. The general school tax levied by the
county board, and collected from all the prop-
erty in the county, but apportioned to the sev-
eral school districts of the county, is not a tax
levied for a county purpose, within the meaning
of the statute fixing a limitation to the levy for
territorial and county purposes.

CONAWAY, J., dissenting.

Error to district court, Johnson county.
Suit by the Powder River Cattle Compa-
ny against the board of county commis-
sioners of Johnson county to recover back
certain taxes paid by plaintiff. Judgment
for defendant county on its demurrer to
the petition. Plaintiff brings error. Af-
firmed.

*Lacey & Van Devanter*, for plaintiff in
error. *H. S. Elliott, A. C. Campbell*, and
*R. W. Breckons*, for defendant in error.

GROESBECK, C. J. This suit was brought
in the district court for Johnson county
by the plaintiff in error against the defend-
ant in error to recover back taxes, and
the penalty accruing thereon, in the sum
of $5,832.64, levied and collected for the
year 1886, and interest thereon from the
date of payment, December 22, 1886. The

defendant in error demurred in said court
to the petitions, original and by way of
amendment, on the ground that they do
not state facts sufficient to constitute a
cause of action. This demurrer was sus-
tained by the district court, and, the
plaintiff company not desiring to plead
further, judgment was rendered against it
for costs, and it brings error to this court.
The facts alleged in the petitions sufficient-
ly appear in this opinion. Three ques-
tions are submitted to us for decision in
the presentation of this case: (1) Was
the tax levy for the year 1886 excessive?
(2) Was the action rightfully brought
against the board of the county commis-
sioners of the county of Johnson? (3) Do
the allegations in the petitions show that
the tax was paid involuntarily? We shall
dispose of these questions in their order.

1. The following levy of taxes was made
by the board of county commissioners for
said year 1886: For territorial revenue,
two mills on the dollar; for county rev-
enue for the county of Johnson, for ordi-
nary county expenses, (as plaintiff sup-
poses,) five mills on the dollar; for county
revenue for the support of the poor and
lunatic, two mills on the dollar; for de-
fraying the expenses of the district court,
five mills on the dollar; for county rev-
enue for roads and bridges, two mills on
the dollar; and a tax for the support of
common schools in the county, of two
mills on the dollar, amounting in the ag-
gregate to the sum of eighteen mills on the
dollar of the assessed valuation of said
property, real and personal, of said coun-
ty. Other taxes for territorial and coun-
ty purposes were levied by the board un-
der special acts of the legislature, author-
izing levies for special purposes. It is al-
leged that under the law in force at the
time of the levy the taxes for the general
purposes mentioned, territorial and coun-
ty, were limited in the aggregate to 16
mills on the dollar, and that the board of
county commissioners had no power or
authority to levy for said purposes to ex-
ceed said limit; and that the levy of 18
mills on the dollar, as made by said board,
is and was illegal, nugatory, and void,
and the collection thereof was illegal and
improper, and the money collected, had,
received, and held by the defendant coun-
ty under and by virtue of said levy was
illegally and improperly collected, had,
and received by it. This compels us to
construe the limitation prescribed for tax-
ation in the law as it then stood, and

Powder River Cattle Co. v. Board of County Com'rs.

which has been incorporated in section 3768 of the Revised Statutes of Wyoming. This section is as follows: "Sec. 3768. There shall be levied and assessed upon the taxable real and personal property within this territory, in each year, the following taxes: *First*. For territorial revenue, two mills on the dollar, when no rate is directed by the territorial board of equalization before the date in each year when the tax ought to be levied and assessed; but in no case shall the tax for territorial purposes exceed four mills on the dollar. *Second*. For county revenue, for ordinary county expenses, not more than five mills on the dollar. *Third*. For county revenue for support of the poor, and lunatic purposes, not more than two mills on the dollar. *Fourth*. For county revenue for road purposes, not less than one mill, nor more than three mills, on the dollar. *Fifth*. The county commissioners f each county shall levy a tax sufficient to defray the expenses of the district courts for their respective counties during each year. *Sixth*. And, in addition to the above, the county commissioners shall levy a poll tax of two dollars for county school purposes, against each person over the age of twenty-one years and under the age of fifty years, which shall be levied and collected as other taxes; and they shall also levy a tax for the support of common schools in their county, not to exceed three mills on the dollar; but the aggregate tax for territorial and county purposes shall in no case exceed sixteen mills on the dollar per annum." The question is whether or not the tax "for the support of the common schools in their county, not to exceed three mills on the dollar," is included in the limitation of sixteen mills for "territorial and county purposes." If it is, the tax levy in Johnson county for the year 1886 was excessive; otherwise not. It is urged with much force that the tax for the support of the common schools of the county is a county purpose, inasmuch as it is levied by the board of county commissioners, and that body has a discretion in levying the amount, to the extent of three mills on the dollar; and because this tax is levied on all the personalty and realty within the county, whether within or without the limits of a school-district; and, further, if it were not a county purpose, it could not be levied at all. The moneys collected for this purpose, together with the poll-taxes, are paid into the county

treasury, and are held subject to the apportionment of the county superintendent of schools, who is required annually, on the first Monday in December, to apportion this "county school tax," and all money in the county treasury, belonging to the "county school fund," in such manner as to first give each school-district in his county, where there are more than eight scholars of school age in the district, $150, for the payment of teachers in such district, and, second, to apportion to each district, *pro rata*, according to the number of pupils in attendance in the schools in said district, reported to him by the several district clerks. After this apportionment, the county superintendent draws an order on the county treasurer in favor of the treasurer of each district for the amount of its proportion of this fund, and this draft is sent to the treasurer of the district. Upon the approval of the official bond of such treasurer by the board of county commissioners, the county treasurer must pay this draft, when properly indorsed. Section 3914, Rev. St. Wyo. It will thus be seen that this fund, called the "county school fund," is set apart for the benefit of the several school-districts of the county, and is at no time subject to the disposition or management of the county board, whose sole duty is to levy the tax and to approve the bond of the treasurers of the school-districts. The tax is for common-school purposes, and is levied by the same body that levies the special school tax in each school-district. Is this purpose a "county purpose," in contemplation of the law? The same legislature, in 1869, that enacted the frame-work of this law, enacted the school law, and therein provided that the county commissioners, at the time of levying tax for county purposes, shall cause to be levied a tax for the support of schools within their county, as provided by law, which shall be collected by the county collector at the same time and in the same manner as territorial and county taxes are collected. Section 3964, Rev. St. Wyo. This provision, with slight modification, has run through every compilation and revision of our laws. It seems to be a concurrent and contemporaneous legislative construction of the term "county purposes," that excludes from such purposes the general school-tax collected from all the property in the county. It was held by the supreme court of Minnesota that, where a maximum tax of three mills on the dollar for

Powder River Cattle Co. v. Board of County Com'rs.

county purposes was prescribed by law; it included only ordinary county expenses, and that the tax for maintaining common schools of two mills was a district, and not a county, tax. But this school tax was distributed in a different manner from our general school tax. It seems that each district was paid the amount of tax collected within its limits. McCormick v. Fitch, 14 Minn. 252, (Gil. 185.) It was said by the supreme court of Florida that "it will be observed that, though the maintenance of schools by counties is a 'county purpose' in a special sense, the law makes a distinction between county taxes, raised for the ordinary purpose of paying the expenses of maintaining county government, and county school taxes, raised for supporting schools. They are deemed distinct funds for distinct objects." Jones v. Board of Pub. Inst., 17 Fla. 411. But the schools there were a county charge, and under the entire management, care, and control of a board of public instruction of the county, who were authorized and required to contract for the erection of school-houses, and to contract with teachers employed in the schools. They had also, under the law, the duty of determining the amount necessary to be raised by annual tax for the support of common schools in their county. There was more reason in holding that the support of the schools of the county was a county purpose, in that state, as they were a county burden, and yet the same distinction seems to be made there as was made in Minnesota.

If the legislature had intended to have the limitation of 16 mills include such "tax for the support of the common schools," the exception and limitation would have read, in effect: "But the aggregate tax for all purposes mentioned in this section shall in no case exceed sixteen mills on the dollar per annum." It is true that by the law passed by the legislative assembly of 1886 the school-tax limit and maximum was raised one mill, and the entire maximum limit, by the same act, raised from fifteen to sixteen mills; but it must be recollected that the territorial limit had before been raised from three to four mills, and at the same session, and in an act taking effect the same day, the road-tax provision was amended by providing that the maximum levy should be three mills, and the minimum one mill, on the dollar; thus amending the old law, which provided for a maximum levy of not more than two

mills for that purpose. It is as reasonable to suppose that the legislature intended to increase the levy for territorial and county purposes as well as for common-school purposes, particularly as the maximum levy for territorial purposes and for county road purposes had been increased by legislation. A careful examination of the section (3768) under consideration would seem to indicate that three distinct objects and purposes were in view in the legislation,—territorial purposes, county purposes, and county school purposes or common-school purposes. The first subdivision treats of and provides for a territorial revenue, the second, third, fourth, and fifth, respectively, of county revenue for ordinary county purposes, for poor and lunatic purposes, for road purposes, and for defraying the expenses of the district court within the county. Then follows the sixth subdivision, which provides that, "in addition to the above,"—that is, in addition to territorial and county revenue for territorial and county purposes, —a poll-tax shall be levied for county school purposes, and "also" a tax for the support of the common schools in the county. This indicates that three distinct purposes were in contemplation in this legislation. The school-districts are distinct corporate entities; and they are corporations, not of the county, but in the county. Section 3925, Rev. St. Wyo. The "county school fund," so called, appears to be created by the general school-tax levied by the board of county commissioners, the poll-tax, and such fines and forfeitures as may be paid into the county treasury according to law. The districts, in their corporate capacity, are entitled to this, and not the county. Not one dollar of this fund can be devoted to any "county purpose." At the apportionment and distribution of this fund, the several school-districts become entitled to their shares of this fund, which requires but a mere mathematical computation to ascertain; and prior to this time the county has not the slightest interest or right to any portion of this fund, and the county board has nothing to say in its management, disbursement, or distribution. It belongs to the school-districts. Brown v. Nash, 1 Wyo. 85, 96. It is within the province of the legislature to make the education of the young a matter of state or of county concern, management, and control; but such is not the manifest intent of the law. It is made a neighborhood or school-dis-

trict concern, and the care, management, and government of the free schools are intrusted to local corporations; a recognition of local pride, and a bringing home to the people the necessity of the great debt the present generation owes to the future generations. Indeed, while this general aid is undoubtedly of great assistance to the school-districts, yet the local and special school-district taxes are generally largely in excess of the maximum rate of the tax known as the "general school tax." This general tax is in the nature of an aid by the tax-payers of the county, and not of the county itself in its corporate capacity, to indigent and struggling districts, as well as to those more densely populated. A sum certain is set apart to each district which has eight or more pupils of school age before the *pro rata* distribution is made. At the time this tax was levied, the county board had no voice or control over the formation of school-districts. That power was lodged in the hands of the county superintendent of schools, and the theory of the statutes relating to schools is to keep them distinct and separate from county affairs, and to make their management, and the distribution of school funds when apportioned and collected, a matter of local concern, without the slightest control or interference of the fiscal board of the county, except in the matter of the approval of the bonds of the treasurers of the school-districts,—a duty that devolves upon that body as to precinct officers generally.

2. Under our statute, the corporate name of the county, and under which it must be sued, is "the board of the county commissioners of the county of ———." Section 1795, Rev. St. Wyo. There is no doubt, then, that the county has been sued in the proper name, if this action can be maintained against it. The law governing the procedure is found in section 3055 of our Revision, and is as follows: "Actions to enjoin the collection of taxes and assessments must be brought against the officer whose duty it·is to collect the same. Actions to recover back taxes and assessments must be brought against the officer who made the collection, or, if he is dead, against his personal representative; and when they were not collected on the tax-list, the corporation which made the levy must be joined in the action: provided, that when the money derived from said taxes or assessment has been actually paid over to any municipal corpora-

tion for whose use and benefit it was levied or collected, then an action shall be brought against said municipal corporation to recover said taxes or assessments." Sess. Laws 1886, c. 60, § 707; Rev. St. Ohio, § 5850. The following provisions may be found in section 3821 of the Revision: "In all cases where any person shall pay any tax, or any portion thereof, that shall thereafter be found to be erroneous or illegal, whether the same be owing to clerical errors or other errors, the board of county commissioners shall direct the treasurer to refund the same to the tax-payer." This section, it is claimed, fixes the liability of the county, and the following decisions have been cited which are in point: Lauman v. County of Des Moines, 29 Iowa, 310, 312, 315, Coal & Iron Co. v. County Com'rs, 59 Md. 255, 261; City of Indianapolis v. Mc-Avoy, 86 Ind. 587, 590. The first of these cases is very broad, and appears to be somewhat modified by later Iowa decisions. Dubuque & S. C. R. Co. v. Board of Sup'rs of Webster Co., 40 Iowa, 16; Butler v. Board, 46 Iowa, 326; Railroad Co. v. Lowry, 51 Iowa, 486, 1 N. W. Rep. 782; Stone v. County of Woodbury, 51 Iowa, 522, 1 N. W. Rep. 745. Under similar provisions it is held in Iowa that it makes no difference whether or not the taxes were paid voluntarily or involuntarily; if erroneous or illegal, they must be refunded. Lauman v. County of Des Moines, supra; Richards v. Wapello Co., 48 Iowa, 507. In this later case cited it was intimated that application should be made to the board of supervisors before the county is put to costs, and that the doctrine of the common law that he who voluntarily pays a tax shall not afterwards be heard to say that it was illegal was based upon the idea that he should have resisted payment of the claim, and that this doctrine pertained to the remedy, and not to the essence of the claim; and the rule was there reiterated that the provision of the Iowa statute (similar to section 3821 of our Revision) provided for the refunding of the tax if the same was erroneously or illegally exacted or levied, even though voluntarily paid. If there is any conflict between these sections,—section 3055, Rev. St. Wyo., which is found in our Code of Civil Procedure, and section 3821, which is a part of the revenue or taxation law,—it becomes necessary in this controversy to construe them, and to determine which should govern. It appears that in the case of Dubuque & S C. R. Co. v Board of Sup'rs of

Powder River Cattle Co. v. Board of County Com'rs.

Webster Co., supra, no point was raised or decided whether or not *mandamus*— that being the form of the action pursued in that case—would lie; and in the other Iowa cases decided, the action was for the recovery of the taxes. It has been repeatedly held that, where there are conflicting sections in the same act the last section should govern, even in a revisory statute, (Suth. St. Const. § 220, and cases cited,) and this for the reason that, "being later in position, the prevailing provision is deemed a later expression of the legislative will." The learned author further says: "This rule, and the reason for it, have been criticised, because, all the provisions of an act being adopted at the same time, there is no priority in point of time on account of their relative positions in the statute. This is strictly true; but, in the reading of a bill, matter near the close may be presumed to receive the last consideration, and, if assented to, is a later conclusion." But we are relieved from adopting this construction, which may be correct, but which seems to be a rule that should be established only after the most careful consideration. The section 3821 appears in the compilation of 1876, (section 43, p. 560,) while section 3055 was enacted in the Code of Civil Procedure adopted in 1886, (Sess. Laws 1886, c. 60, p. 128,) and was not a part of the old Code, or known to our laws prior to that time. Although both of these sections are found in our Revised Statutes, the rule is as stated in Suth. St. Const. § 161: "Where two statutes *in pari materia*, originally enacted at different periods of time, are subsequently incorporated in a revision, and re-enacted in substantially the same language, with the design to accomplish the purpose they were originally intended to produce, the times when they first took effect will be ascertained by the courts, and effect will be given to that which was the latest declaration of the will of the legislature, if they are not harmonious." The following cases are cited: Winn v. Jones, 6 Leigh, 74; Blackford v. Hurst, 26 Grat. 206; Hurley v. Town of Texas, 20 Wis. 638; U. S. v. Bowen, 100 U. S. 508; Vietor v. Arthur, 104 U. S. 498; Bank v. Patty, 16 Fed. Rep. 751,—and a careful examination of these authorities shows that the author has very clearly deduced the rule which he lays down on this subject. It follows, therefore, that the Code of 1886 being the latest declaration of the legislative will, effect must be given to it, and that, therefore, section 3055 must supplant the provisions of section 3821, as the latter section was enacted first.

It seems that section 3055 is a right given by the statute, and a specific remedy provided, and that this right can be vindicated in no other way than that prescribed therein. Suth. St. Const. § 399; Shelton v. Platt, 139 U. S. 591, 597, 11 Sup. Ct. Rep. 646. Of course, this section being remedial in its nature, it must be liberally construed. Indeed, this is required in the Code of Procedure itself (section 2338, Rev. St.;) but this liberal construction cannot so operate as to defeat the plain legislative intent, or to uphold an absurd construction. How, then, shall this section 3055 be construed? It provides that "actions to recover back taxes and assessments must be brought against the officer who made the collection, if living, or, if he is dead, against his personal representative." So far, it is plain. This is, in substance, the Ohio statute; but we have a proviso annexed to this enactment, which it is contended materially alters the remedy. It is "provided that, when the money derived from said taxes or assessments has been actually paid over to any municipal corporation for whose use and benefit it was levied or collected, then an action shall be brought against said municipal corporation to recover said taxes or assessments." This statute without the proviso was held in Ohio to have created new statutory rights of action, not theretofore existing, and was enacted in order to provide a simple and speedy remedy to the tax-payer. Stephan v. Daniels, 27 Ohio St. 527. Before its enactment, in order to recover taxes paid under protest, or involuntarily, the tax-payer would have doubtless been compelled to parcel out his remedies, to resort to the county for all taxes collected by it, to the different school-districts of the county for the general school tax collected under the levy for the support of common schools, and paid over to them, and to ask the territorial legislature for relief from territorial taxes. Price v. Lancaster Co., 18 Neb. 199, 24 N. W. Rep. 705. "In some states provision is made by law for the refunding by the state, through the counties, of sums illegally collected as state taxes, and under such a provision the county may be sued on a presumption that the state has performed its duty in supplying the means." Cooley, Tax'n, p. 804. The only provision of our law is that

### Powder River Cattle Co. v. Board of County Com'rs.

found in section 3836, Rev. St., which states that "each county is responsible to the territory for the amount of tax levied for territorial purposes, excepting such amounts as are certified to be double or erroneous assessments; and no allowance or credit shall be given to any county for any part other than this of such tax levy remaining uncollected." This section was amended by chapter 45, and by section 10 of chapter 72, Sess. Laws 1890, so that said section 3836 shall read as follows: "Each county is responsible to the territory for the amount of tax levied for territorial purposes, and no allowance or credit shall be given to any county for any part thereof." But this section, as originally enacted, was restored and re-enacted by the later act, chapter 36 of the Session Laws for 1890–91.

The state or territory had never on the statute-books any law allowing the refunding of state taxes, except for erroneous and double assessments. In the case of Lauman v. County of Des Moines, supra, it was held that a tax should be refunded, erroneously or illegally levied, though voluntarily paid, and that this would necessarily include state taxes, as it was presumed that the county has always state moneys in its treasury, and that the duty was upon the county in the first instance to refund this money, and all of it, collected for the different funds; but this decision has been much modified and explained away in recent Iowa decisions cited supra, particularly in Railroad Co. v. Lowry, 51 Iowa, 486, 488, 489, 1 N. W. Rep. 782, where, in the opinion, it was said: "It may be conceded for our present purpose that a tax of this kind, when declared illegal, must be refunded to the tax-payers under Code, § 870. But it is very clear that such illegal tax cannot be refunded out of county revenue. Butler v. Board, 46 Iowa, 326. It must be repaid, if at all, from the special fund created by the tax itself." It is clear, then, that the county could not be liable for state or territorial taxes collected by it under our statutes, and under the common law it could doubtless only be sued for taxes paid over to it by the collecting officer, and received to the use of the municipality. Cooley, Tax'n, p. 805; Railroad Co. v. Buffalo Co., 14 Neb. 51, 55, 14 N. W. Rep. 539. It would appear that the object of the statute, section 3055, and the other sections of the same chapter, was to afford a simple and speedy remedy to

the tax-payer, to allow him an injunction if the tax was alleged to be illegal before its collection, and a right to recover all taxes paid, after collection, from one source, and without a multiplicity of suits. The only exception is in the proviso, and that is when the tax money has been paid over to a municipal corporation, for whose use and benefit it was levied and collected; and then such corporation must be sued. It is insisted for plaintiff in error that counties are included in this term, "municipal corporations," and we are compelled to give our construction of its use in this proviso. The authorities cited by counsel for the respective parties show that these words are employed in different uses, in a broad sense, and in a proper or restrictive sense. In one case it has been said: "That 'municipal corporations' especially refers to counties, school-districts, and cities, etc., cannot admit of debate. It has never been construed otherwise." Land Co. v. Carroll Co., 39 Iowa, 166. See Curry v. District Tp. of Sioux City, 62 Iowa, 102, 104, 17 N. W. Rep. 191; Laramie Co. v. Albany Co., 92 U. S. 308; Town of Freeport v. Board, 41 Ill. 499; Dowlan v. County of Sibley, 36 Minn. 430, 31 N. W. Rep. 517. But in the case of State v. Leffingwell, 54 Mo. 465, the court say: "We thus perceive that there are not only two classes of public civil corporations; but the word 'municipal' has double meanings,—one a narrow, confined meaning, as relating to *municipium*, or free town, or, as we should say in the present age, relating to cities, towns, and villages; and another broader and more usual signification, relating to the state or nation. And therefore, while the words 'municipal corporations' have a well-defined meaning, and embrace cities, towns, villages, and nothing more, the words are not at all equivalent to those other words, 'for municipal purposes.' The latter embrace, by the common speech of men before and since the days of Blackstone, state or national purposes. And therefore, while municipal corporations are for municipal purposes, there are other corporations for municipal purposes that are not strictly municipal corporations." In a prior Missouri case the court say: "The general accepted definition of a 'municipal corporation' would only include organized cities and towns, and other like local organizations, with political and legislative powers for the local civil government and police regula-

tions of the inhabitants of the particular districts included in the boundaries of the corporations." See Dillon's definition therein: "'Thus an incorporated school-district or county, properly speaking, is not, while the city is, a municipal corporation.' Again, in speaking of school-districts, road-districts, counties, townships, etc., Judge Dillon says: 'They are purely auxiliaries of the state, and to the general statutes of the state they owe their creation; and the statute confers all the powers they possess, prescribes all the duties they owe, and imposes all the liabilities to which they are subject. Considered with reference to the limited number of their corporate powers, the bodies above named rank low down in the scale or corporate grade of corporate existence; and hence have been frequently termed "*quasi* corporations." This designation distinguishes them on one hand from private corporations proper, such as cities or towns acting under charters,' etc. Dill. Mun. Corp. pp. 30–33. From the foregoing authorities, as well as from the reason of the case, I am satisfied that the term 'municipal corporations' does not, in its common acceptation of its legal sense, include school-districts or corporations organized for the purpose of education only, either in connection with our common-school system or otherwise; and that the legislature, in rendering officers of a municipal corporation ineligible to the office of county justice, never intended to include school trustees." Heller v. Stremmel, 52 Mo. 312. See People v. Johnson, 30 Cal. 99; People v. Sacramento Co., 45 Cal. 692. Say the court in the case of Downing v. Mason Co., 87 Ky. 208, 8 S. W. Rep. 264: "It [a county] is not, in the strict legal sense, a municipal corporation, like a city. As a *quasi* corporation it is distinguishable both from a private corporation and a municipal corporation proper." In short, the statement in the case of Land Co. v. Carroll Co., supra, is too broad, for sometimes the words "municipal corporations" are held to include counties, and not at other times. In Dowlan v. County of Sibley, 36 Minn. 430, 31 N. W. Rep. 517, the word "municipal" was considered to have been used in the sense of "political" or "public." The term is evidently to be construed either way, in the broad sense, or in the proper or restrictive sense, with reference to the legislative intent and habit in the same or kindred legislation. The construction hinges on the context. A careful examination of this section 3055 leads to the belief that the legislature employed these words in their proper, limited, and restrictive sense, and not in a broad sense, as to include all corporations, political and public; otherwise, the mischief sought to be remedied, and the evil attempted to be cured, would not be affected, and the proviso to the section would absolutely defeat the plain intent of the legislature, for if the term "municipal corporation," in the proviso, includes counties, it must necessarily include school-districts as well, and the tax-payer seeking to recover illegal or erroneous taxes would be as perplexed and harassed as before the passage of this remedial legislation. He would be forced to sue the county for the moneys collected and paid over to it for its use and benefit, each of a number of school-districts in the county for its proportion of general school tax apportioned to it, and to seek relief from the legislature for territorial or state taxes illegally levied or collected. Again, a proviso carves special exceptions only out of the enacting clause; and those who set up such an exception must establish it as being within the words as well as the reason thereof. U. S. v. Dickson, 15 Pet. 141. The petition in the court below shows, and the law was and had been for more than four years before the enactment of section 3055, that the county treasurer should be *ex officio* collector of taxes. When the plaintiff in error paid its taxes which it seeks to recover, the payment was made to the collector and to the county treasurer, and, so far as county taxes proper were concerned, they were then paid over to the proper custodian of the county, and for its use and benefit. Then, if a county is a "municipal corporation" within the meaning of the section and the proviso, no case could possibly arise where the collector of county taxes could be sued. If, on the other hand, keeping in view the language invariably used in our legislation, treating towns and cities as the only municipal corporations known to our laws, we hold that the legislature used these words in their proper sense, we have no difficulty in construing the proviso of the section reasonably and consistently with the other parts of the section. The tax collector, and he alone, is responsible; and the remedy must be pursued against him, if living, or his personal representatives if dead, for the space

Powder River Cattle Co. v. Board of County Com'rs.

of one year,—the limitation of time for bringing such suits imposed by the statute,—unless the remedy is sought against a municipal corporation, a city, or town, in which case, if the tax money has been actually paid over by the municipal collector to the municipality for whose use and benefit it was levied and collected, the city or town must be sued, instead of the collector. The taxes levied for such municipalities are wholly levied and collected for their own use and benefit, and are disbursed by them; hence there is no necessity for pursuing the collector, as there is but one corporation to look to for the money. The county, by law, is made the collecting agent for the state or territorial taxes, for county taxes proper, for the general school tax, and for special school-district taxes, thus acting for three distinct corporate entities; while a municipality, such as a town or city, is the sole beneficiary of the tax levied by it.

It may be said that this statute is unnecessarily severe upon collectors, as they might not be legally entitled to reimbursement for whatever they might be compelled to pay in a suit to recover taxes. It was suggested in a very able treatise found in the Weekly Law Bulletin, (volume 14, pp. 248, 261,) an Ohio publication, that the collector could keep the money, when aware that the payment was made under protest, and with the intention of instituting suit, for the year, and until the action became barred by the limitation referred to and provided in the act, and thereby protect himself; but this pleasing construction was, so far as the Ohio law was concerned, repudiated by the Ohio supreme court in the case of Ratterman v. State, 44 Ohio St. 641, 10 N. E. Rep. 678, where it was held that the officer, having received the moneys as treasurer, and, it seems, as collector also, must pay it out according to law; and that any other course on his part would work infinite embarrassment to the state and to the several counties, municipalities, towns, and school-districts entitled to portions of the public moneys, as they might be left without funds during the litigation, and the administration of public affairs be greatly, if not wholly, obstructed, while the money to which they were entitled was lying idle in the hands of the treasurer, subject to the perils incident to such a situation; and that the treasurer, if he found the duties of his position involving too much hardship, or too much liability,

could solve the problem by resignation. It is not profitable to discuss this matter at length, as the duty of courts is to enforce the laws as they find them, if constitutional, and not to remodel them to suit a judicial whim. The statute giving the remedy may appear to be a novel one. A recent decision of the supreme court of the United States shows that one similar to it has been in operation in Tennessee since 1873, and was pronounced by that court to be simple and effective. Tennessee v Sneed, 96 U. S. 69. But in that state, if the court determines that the tax was wrongfully collected, upon its certificate to that effect the comptroller issues his warrant for the same, which shall be paid in preference to other claims on the treasury. This act as to state taxation has been upheld by the courts of Tennessee. Shelton v. Platt, 139 U. S. 591, 597, 11 Sup. Ct. Rep. 646. It is true that in several instances suits have been brought against the county in its corporate capacity, the board of the county commissioners in the territory, and without apparent question, for the recovery of illegal taxes, since the adoption of the present statute under consideration; but the cases are few, and only one has been cited which found its way into the territorial supreme court. This question was not raised there, and it seems that the case was submitted upon the merits, without question as to the method of procedure. Fremont Co. v. Moore, (Wyo.) 19 Pac. Rep. 438.[1] Although eminent counsel were represented in the case, the point as to the right to sue the county was not raised or alluded to in the briefs of counsel or the opinion of the court. As the statute was then a fresh one, and new in its application, and the question was not presented to the court, we do not feel bound by the silence of the court on this point. The disposition of these two points renders it unnecessary to discuss the remaining one,—that of voluntary payment,—which is a vexed question, and one that should be presented to the court upon a fuller argument, and a more careful consideration of the case. For the reasons assigned herein, that the tax was not excessive, and that the action could not have been brought or maintained against the defendant in error, the judgment of the district court of Johnson county, sustaining the demurrer to the several petitions, and entering judgment

[1] Ante, 200.

against the plaintiff in error on failure to plead further, is affirmed. .

MERRELL, J., concurs.

CONAWAY, J., (*dissenting.*) With all due respect I have to announce that I cannot concur with the majority of the court in this case; and, from the importance of the case, and the nature of the questions involved, as well as other considerations, it seems due to the parties, and to the attorneys who have labored so faithfully and well on this case, that I should state the reasons for my dissent. I feel that I shall not be able, in the space to which I have thought proper to limit myself, to make the fallacy of the arguments in fa-·vor of the view opposed to my own so clear as it appears to myself. Some important and pertinent considerations have been omitted. Others I have barely touched upon. But a word to the wise is sufficient. And there are times when a suggestion answers for an argument.

This is an action to recover taxes back which were collected under a levy alleged to be excessive and illegal. To the petition alleging such illegality of the levy there is a general demurrer, which was sustained by the court below. From the judgment sustaining the demurrer plaintiff prosecutes his petition in error. The legality or illegality of the levy depends upon the construction of a section of the Revised Statutes of Wyoming, which reads as follows: "Sec. 3768. There shall be levied and assessed upon the taxable real and personal property within this territory, in each year, the following taxes: *First.* For territorial revenue, two mills on the dollar, when no rate is directed by the territorial board of equalization before the date in each year when the tax ought to be levied and assessed; but in no case shall the tax for territorial purposes exceed four mills on the dollar. *Second.* For county revenue, for ordinary county expenses, not more than five mills on the dollar. *Third.* For county revenue for support of the poor, and lunatic purposes, not more than two mills on the dollar. *Fourth.* For county revenue for road purposes, not less than one mill, nor more than three mills, on the dollar. *Fifth.* The county commissioners of each county shall levy a tax sufficient to defray the expenses of the district courts for their respective counties during each year. *Sixth.* And, in addition to the above, the county

commissioners shall levy a poll-tax of two dollars for county school purposes, against each person over the age of twenty-one years and under the age of fifty years, which shall be levied and collected as other taxes; and they shall also levy a tax for the support of common schools in their county, not to exceed three mills on the dollar; but the aggregate tax for territorial and county purposes shall in no case exceed sixteen mills on the dollar per annum." The aggregate amount of the levy in question in this case, under this section, being the levy for the year 1886, is 18 mills on the dollar. Two mills of this levy was under the sixth subdivision, for the support of common schools in the county. It is urged that this is not a tax for territorial or county purposes. If it is such a tax, the levy is admitted to be excessive; otherwise it is not excessive. It is not questioned that the support of the common schools in the counties respectively is a legitimate purpose for county taxation, and that the legislature had authority to include it in the territorial and county purposes mentioned in section 3768. It is a question of legislative intent. Did the legislature mean that the county tax for the support of common schools in the county was a tax for a county purpose? The first subdivision provides for territorial revenue. This levy was either made by the territorial board of equalization within the four-mill limit, or, if the board did not act, it was fixed by the law at two mills. In either case the board of county commissioners had no control over the amount of this levy. It is a separate matter from the county taxes levied by the board, and requires no consideration in this connection. The levy of the taxes for county purposes, over which the board had control, it was its duty to fix so that such taxes, together with the territorial tax already fixed, should not exceed in the aggregate 16 mills on the dollar. I concur with the opinion of the majority of the court that the two-mill territorial tax cannot be recovered in this action. It is, the county tax, if any, that is excessive. The territorial tax is not excessive in itself, and is not inseparably blended with the county tax. The second subdivision provides for the tax for county revenue for ordinary county expenses. The counties are made bodies politic and corpo·rate, and their ordinary corporate powers and functions fixed by other statutory provisions. The ordinary county expenses.

Powder River Cattle Co. v. Board of County Com'rs.

here provided for are evidently such as are necessary to the maintenance of the corporate existence of the counties, and the effectual discharge of their ordinary corporate functions. Each of the remaining four subdivisions of section 3768 provides for a special county tax for a special purpose. Can a county tax be for other than a county purpose? Defendant in error contends that it may, and that the county tax for the support of the common schools in the county is, in effect, not a county tax, or for county purposes, but a school-district tax, and for school-district purposes. It is admitted that the tax for the support of the poor and lunatic is a county tax for county purposes; that the tax for road purposes is a county tax for county purposes; that the tax for district court expenses is a county tax for county purposes. But it is denied that the tax for the support of the common schools in the county is a county tax for county purposes. Why is the line drawn at common schools? Why is any line drawn between taxes levied by county authority upon all the taxable property in the county?

The first revenue law of Wyoming, approved December 10, 1869, began with the section under consideration substantially in its present form. There have been some amendments enacted since; but these amendments are not such as to affect the question now under discussion,—whether our different legislatures have meant to include the support of the common schools in the counties respectively under the head of county purposes in the law requiring the counties to levy a tax for that purpose. The question is, what has been the intention of our legislatures? The revenue law of 1869 was entitled "An act to provide a territorial and county revenue." Leaving out of view for the present the sixth subdivision of this section as the section occurs in that act, there is not a line or a word in the entire act indicating a departure from the subject expressed in the title, or indicating that any portion of the revenue provided for in the act was to be considered as school-district revenue, or indicating that the legislature by that act intended or attempted to do anything else than to provide a territorial and county revenue, or that they had any suspicion that they were doing anything else. Several succeeding legislatures have made amendments to this law, all referring to it as "An act to provide a territorial and county revenue," with nothing to indicate

a suspicion that the act was anything more or less than or different from what was indicated by its title. And finally, in the Revision of 1887, the section appears as the opening section of the first chapter of title 43, entitled "Revenue—Territorial and County." And still not a line or a word in the section or the chapter or the several chapters constituting the title, to indicate a suspicion on the part of the compilers or the legislature that in adopting and re-enacting those chapters they were doing anything except to provide a territorial and county revenue. The question is, what was the intention of our legislators? Defendant in error derives an argument from a verbal criticism of the language of the sixth subdivision of the section under consideration. It is argued that an inference arises from the use of the words, "in addition to the above," and "also," that the purpose of the tax changes from county purposes to some purpose which is not a county purpose. The inference to be justly drawn from such verbal criticism is not a conclusive one or a strong one, but, such as it is, in this instance it tends precisely the contrary way. To illustrate: The first subdivision is in express terms for territorial revenue. The second subdivision is in express terms for county revenue for ordinary county expenses; an express change of purpose. Now, it would have been a strange use of language if the second subdivision had read: "And, in addition to the above, the county commissioners shall also levy for county revenue for ordinary county expenses not more than five mills on the dollar." It would be asked, and pertinently asked, why is the county tax for ordinary county expenses called a tax in addition to the territorial tax? How is it added to the territorial tax? How does it increase the territorial tax? Do our legislators mean that a tax for territorial revenue is a tax for county revenue? That territorial revenue is county revenue? If we have authorized a subscription of four dollars for any purpose, and then afterwards say that, in addition to the four dollars already subscribed, we will also give five dollars more, every one readily understands that the additional subscription is for the same purpose as the original; else there is no propriety in saying that it is in addition thereto. If for a different purpose, it would not be in addition to the former. It would not be added to it or increase it. So, if the tax provided

Powder River Cattle Co. v. Board of County Com'rs.

for by the sixth subdivision is for a general purpose, different from the taxes immediately preceding, there is no propriety in saying that it is in addition thereto.

It is asked why subdivision 6 is introduced by the words, "in addition to the above," and no preceding subdivision is. I do not know that this question carries any argumentative force for or against either view of the question under discussion, or that it requires any explanation or discussion. It may very well be said that the legislative draughtsman did not happen to use that form of expression in preceding subdivisions. Legislatures are independent in the use of language, as in everything else. But the words are used in the sixth subdivision evidently because the tax therein authorized, being a tax of the same general nature, was in addition to the above; that is, a tax for county purposes. Thus the use of the words, "in addition to the above," and "also," indicate rather a continuance of the subject of taxes for county purposes than a breaking off from it. And if the county tax for the support of the common schools in the counties respectively is neither for a territorial nor a county purpose, with no propriety whatever can it be inserted in an act to provide a territorial and county revenue. Such a thing may be done,— sometimes is done. But it is a vicious system of legislation, and all presumptions are against it, and it is now forbidden by our constitution. At common law the title of the law was not fixed by the legislature,—that is, parliament,—but by the clerk for convenience of reference; and so was no part of the law. But our legislatures do fix the title, and while it will not control express and strong language in the body of the law, it is of controlling weight, in case of doubt, in ascertaining the legislative intent. And, further, as to the language of this sixth subdivision. The latter part reads: "And they [the county commissioners] shall also levy a tax for the support of the common schools in their county, not to exceed three mills on the dollar; but the aggregate tax for territorial and county purposes shall in no case exceed sixteen mills on the dollar." This last clause, commencing with "but," is immediately connected with and naturally refers to what immediately precedes it; and it is doing unnecessary and wanton violence to language to construe it otherwise. It really admits of no other construction. It is not a matter within the scope of statutory construction to apply a clause elsewhere than where it occurs. The construction contended for by defendant in error would simply wrest this clause from its place at the close of the sixth subdivision of the section, and the close of the section, and from its place at the close of the sentence where it occurs, sever it from its connection with the language and the subject-matter there where it was placed and retained by the legislation of more than two decades without question as to its application or its meaning, and in effect insert it in another place in the section, and at another place in the sentence. I know of no rule of construction that will justify or permit such violence to the language, much less to the substance, of legislative enactments. We have been told in argument how the legislature could have made their meaning clear, if they intended the county school tax to be included in the tax for county purposes, by a change in the language. Is it necessary to suggest that, if they had wanted the concluding clause of the section to apply, not at the close, but in the body of the section, they would have placed it there; and that that simple change, without the change of a word in the language used, would have made the meaning clear to apply the clause only to what preceded it? But, as they actually placed the clause at the end of the section, the meaning is still clear. Do we need to ask what was the intention of our legislators? But it is urged that the clause is in the nature of a proviso, and that it is customary to place provisos at the close of the sections in which they occur. This is a mistaken idea. The division of matter into sections is regulated by no known rules, but is purely arbitrary; and provisos occur at the close of sections when they belong there, and in the body of sections when they belong there. We come upon examples of the latter class in scanning our revenue and school laws in connection with this case, (Rev. St. §§ 3856, 3914, 3931,) and in other laws, (Id. §§ 3673, 3746, 3877,) and in the state constitution, (article 15, § 10.) And we are told that provisos are to be strictly construed. How this rule, if correct, and applicable here, avails defendant in error, is another obscurity. The attorneys for defendant in error have been very liberal with themselves in their treatment of the legislative language under consideration. They have torn the concluding clause of the section

Powder River Cattle Co. v. Board of County Com'rs.

from its place in the section, and in the sentence, and have inserted it in effect where it suited them better, although it is in the nature of a proviso. They have supplemented the words, "in addition to the above," in various ways, such·as, "in addition to the above territorial and county taxes," "in addition to the above, —that is, in addition to territorial and county taxes for territorial and county purposes;" and they have exhausted the resources of the art of elocution in the emphasis and variety of inflections with which these interpolated words have been uttered,—all to indicate that the "above" taxes only are for territorial or county purposes, while the tax below is for neither. It is not strict construction of a proviso or of any provision of law to take it from its place, and apply it elsewhere. It is not judicial construction at all. It is making a new law. It is legislation. And so is the addition of words to, or interpolation of words in, the language of a statute.

It is urged that in the levy, collection, and distribution of this tax the counties are but the agents of the school-districts. This proposition involves the absurdity that any school-districts, either by themselves or through an agent, can levy a county tax. The tax under consideration is not a school-district tax. It is a county tax. It is levied by the county commissioners, at their own discretion, within the three-mill limit, upon all the taxable property in the county. It requires no action of the school-districts to put them in motion as to this tax. No such action could have any effect. Neither can the school-districts prevent the tax or limit it. The tax goes into the same fund, and is handled in precisely the same way, as the poll-tax, which is expressly "for county school purposes." It is a "county school tax," and goes into the county school fund. Rev. St. § 3914. But why school-districts should be mentioned in the discussion of section 3768 is not apparent. No school-district is known to this section, or to our revenue law, of which this section is a part. No school-district is therein mentioned or referred to. No school-district is necessary to the doing of a single thing authorized by this law to be done. All school-districts might be abolished without affecting the operation of this section, or of any portion of the revenue law, in the slightest particular. This tax is not to keep up school-districts.

It is for the support of the common schools of the county. It would not affect the tax in the least, or its levy or collection, or change its purpose, if all school-districts were abolished, and other means employed for the distribution of the benefaction of the counties to the common schools. The tax is levied upon all the taxable property in the county. It matters not·whether the property is situated in school-districts or not. Is it possible that any school-district, by itself or through an agent, can tax property not located, either actually or constructively, within its boundaries? Yet to this absurdity are we driven by the sophistries of defendant in error. And the question is, what was the intention of our legislatures? But since the school-districts are the agencies now employed for the conveyance of the county aid to the common schools, and since, however erroneously, they have been made to occupy so prominent a place in this discussion, let us consider further how the doctrine of an agency for them in the counties fits the law and the facts of the case. The school-districts are formed by the county superintendent. He is required to divide the settled portions of the county into school-districts. He must ascertain, and, in his discretion, decide, what portions are settled. He fixes the size, shape, and·locality of the districts in the portion of the county which he finds to be settled. Other county officers levy this tax, fixing the amount within the three-mill limit; and they do this either before or after the school-districts are formed. It is not necessary for them to inquire or to know whether there are any school-districts in the county or not. They are not raising school-district funds, but a "county school fund" for the support of the common schools in the county. It may be administered through the agency of school-districts,·or not. That is immaterial. Then another county officer collects the tax; and holds it for distribution. Then the first officer apportions it to the school-districts, and gives orders for the payment of the money. In all this no action is required or is possible on the part of the school-districts. All this may be done before the school-districts are formed. Any of them may lapse or perish, or all of them be abolished by legislative action, before the distribution of the tax takes place. In any event, they ·have positively no control in these matters,—nothing to

say, and nothing to do. And this is all the counties do in the matter of this tax. Where is the agency? When the school-districts can do nothing, do they require an agent to do nothing for them? When the counties are required to act in direct and positive language by the statute, can it be the meaning of the law that they are to act as agents of school-districts that may never be in existence, or that may lapse and perish at any time, or be abolished by any legislature? Does the county support of the common schools depend upon any or all of these contingencies? What was the intention of our legislatures?

It is argued that the legislature of 1869, which first used the words "county purposes" as they occur in the law under consideration, gave a legislative construction of the words, excluding county school purposes. In an act providing for the organization of school-districts, passed by that legislature, occurs the following: "Section 1. The county commissioners shall, at the time of levying the tax for county purposes, cause to be levied a tax for the support of schools within the county of not more than two mills on the dollar of the assessed value of all taxable value, real and personal, within the county, which shall be collected by the county collector, at the same time, and in the same manner, as territorial and county taxes are collected, except that it shall be received in cash or warrants of the school." There are several things in this section which are not clear. It is not clear whether the words, "schools within the county," mean the same as "the common schools within their county," in section 1 of the revenue law of 1869, and in section 3768 of the Revised Statutes. It is not clear whether "all taxable value, real and personal, within the county," means the same as "all taxable property, real and personal, within the county." It is still more difficult to understand where the warrants of the school were to come from in which this tax is payable; such a thing as warrants of a school being unknown in our law at that time, or before or since. The section, taken altogether, is simply incomprehensible. And this may in a manner explain the fact that there has never been any attempt made to enforce it. But it is claimed that this section "carefully distinguishes" between a tax for the support of schools within the county and the "tax for coun-

ty purposes" and the "territorial and county taxes" mentioned therein. But it does not say that the tax for the support of schools within the county is not a county tax for a county purpose, and is not included in territorial and county taxes. This is only an inference. And section 36 of the revenue law, passed by the same legislature, contains the following: "Money only is receivable at the county treasury for poll-tax and school-tax; all other county taxes may be paid in county warrants." This seems at least to do away with the careful distinction between county taxes and school taxes, and is a legislative construction the other way; and the "warrants of the school" are ignored.

Florida decisions and Minnesota decisions are quoted to show that there is a distinction between taxes for ordinary county expenses and taxes for county school purposes. They make such a distinction. So does our statute. But it makes the same distinction between taxes for ordinary county expenses and taxes for the support of the poor and lunatic, for roads, and for district court expenses. The tax levy for ordinary county expenses is provided for in the second subdivision of section 3768, and all other county taxes for their several special purposes are on a similar footing with each other. They are all special county taxes to discharge special county burdens imposed by statute. They are all for county purposes in the same sense. If the county school tax is to be excluded in computing the aggregate under the 16-mill limit, there is no reason why the county road tax should not go with it, or the tax for the support of the poor and lunatic, or that for district court expenses; and this is the view that has always prevailed in our courts, as well as in our legislatures. And the question has not been overlooked, as suggested. The first case reported, involving this point, was an action to recover taxes back which had been paid for the years 1873, 1874, and 1875. The case has been since overruled, or materially qualified, as to another point, but not as to the matters under discussion here. The case was submitted on an agreed statement of facts, of which the following is a part: "It is further admitted as a fact that portions of the taxes aforesaid, paid by said plaintiff, were poll-taxes, and portions were territorial taxes, and portions were for the county school fund of said county; and

that all of said taxes belonging to the county school fund of said county were paid out and delivered to the several school-districts of said county before the commencement of this action, the same having been duly apportioned to said districts." Moore v. County Com'rs, 2 Wyo. 8. The entire amount of the taxes was all recovered back from the county, including the county school tax, although it had been distributed to the school-districts. That this county school tax was properly placed on the same footing with other county taxes has never before been questioned since the decision cited. A number of similar cases have been before our courts, and the matter has been subject to and has received the careful scrutiny of our best legal and judicial talent. The point has not been again expressly decided in any reported opinion, because the correctness of the established view has not been seriously questioned; but it has been quietly and intelligently acquiesced in and acted upon by bench and bar, and by our counties and school districts. As to this question we might well adopt the language of the supreme court of Iowa in reference to the doctrine of an old case as to a point upon which there were no recent decisions. The court says; "We will not enter into an inquiry of the principles upon which it is founded, with the purpose of vindicating its correctness. It has stood unquestioned for more than fifteen years, and has been doubtless often followed by the *nisi prius* courts, and esteemed by the profession as a part of the body of the laws of the state. Stability in the laws is of first importance to the people and to the courts." So this county tax for the support of the common schools has been recognized as a tax for a county purpose by more than two decades of legislation treating it continually under the head of territorial and county revenue, and by almost two decades of concurring judicial construction placing it on the same footing with other county taxes. And, finally, this construction has been adopted, crystalized, and made permanent in the state constitution. Article 15, § 5. And the question is, what was the intention of our legislatures?

But we are told that the money arising from the county school tax is trust money in the hands of the county treasurer, and that the county has no control over it, but must apply it according to law, and it must go to the school-districts. The

county exercises its control in the most material point of determining the amount of the levy. That it is trust money in the hands of the treasurer is true. And it is equally true that each of the other three special county taxes already mentioned produces trust money in the hands of the treasurer, that must be applied to its special purpose, according to law. That in the one case school-districts intervene as a means or agency in making the application of the county money to its ultimate purpose, and in the other cases other means or agencies are employed, is immaterial. The material considerations are identical in each case. Each is a county tax for a county purpose,—the purpose of discharging a burden imposed upon the county by the law. There can be no question that education is a proper purpose for state taxation, for county taxation, and for school-district taxation. In Wyoming it has been made a lawful purpose for state taxation to the extent of maintaining a territorial and state university, and in encouraging education in other ways. It has been made a lawful purpose for county taxation to the extent of requiring each county to levy a tax for the support of the common schools in the county, not exceeding three mills on the dollar per annum. It has been made a lawful purpose for school-district taxation to the extent of authorizing a heavy additional tax for school purposes in the districts, respectively, to be imposed by vote of the electors thereof. Taxation must be for a public purpose; public in its nature, and public as being a matter of general and common interest to the district or territory taxed. State taxation for state educational institutions is legitimate, the people of the entire state being similarly interested. County taxation for the support of the common schools in the counties, respectively, is legitimate, the people of each county being more interested in the schools within its limits than are the people of the state at large. School-district taxation for the support of the schools within the district is legitimate, the people of the district being specially interested in its schools. In the language of Judge Cooley: "It can therefore be stated with emphasis that the burden of a tax must be made to rest upon the state at large or upon any particular district of the state, according as the purpose for which it is levied is of general concern to the whole state, or, on the other hand, pertains only to the par-

ticular district. A state purpose must be accomplished by state taxation; a county purpose by county taxation; or a public purpose for any inferior district by taxation of such district. This is not only just, but it is essential." Cooley, Tax'n, p. 141. Also 1 Desty, Tax'n, pp. 26–30, and cases cited by both authors. So the mere fact that the tax in question is a county tax settles the question that it is for a county purpose, or not valid taxation at all. And not a single authority has been cited to the contrary. The proposition is, axiomatic. No more will we ask, what was the intention of our legislatures? It is too plain for query. If an apology is due for arguing at length this proposition, which is elementary in the law of taxation, the apology is found in the earnestness and artfulness with which the opposite view has been urged. With all due respect for the opinion of those who differ from me, I must say that I regard the levy of the county taxes in controversy as excessive, beyond question.

The next question is, who should be sued,—the collector or the county? There are two sections, intimately connected, which it seems necessary to consider together in determining this question. They occur in the Code of Civil Procedure, and section 2338, on construction, applies to them. "Sec. 2338. The provisions of this title and all proceedings under it shall be liberally construed, in order to promote its object, and assist parties in obtaining justice; and the rule of the common law, that statutes in derogation thereof must be strictly construed, has no application to this title; but this section shall not be so construed as to require a liberal construction of provisions affecting personal liberty, relating to amercement, or of a penal nature." The following are the sections to be construed: "Sec. 3054. Actions to enjoin the illegal levy of taxes and assessments must be brought against the corporation or person for whose use and benefit the levy is made; and, if the levy would go upon the tax-list, the county treasurer must be joined in the action." "Sec. 3055. Actions to enjoin the collection of taxes and assessments must be brought against the officer whose duty it is to collect the same; actions to recover back taxes and assessments must be brought against the officer who made the collection, or, if he is dead, against his personal representative; and, where they were not collected on the tax-list, the cor-

poration which made the levy must be joined in the action: provided, that when the money derived from said taxes or assessment has been actually paid over to any municipal corporation for whose use and benefit it was levied or collected, then an action shall be brought against said municipal corporation to recover said taxes or assessments." Plaintiff in error alleges that the taxes in question herein were illegally levied and collected, and were paid to and collected by the collector for the use and benefit of Johnson county, and immediately paid over to or charged to himself as treasurer of said county, and afterwards paid out by him for its use and benefit, and upon warrants and demands against it, and at its instance and request, and by its authority. The statement is thus as clear as general allegations can make it that Johnson county is the corporation for whose use and benefit the tax was collected, and to which it has been paid over. But it is objected that the county school tax is not under the statute, for the use and benefit of the county, although alleged to be. This objection is substantially the same as the objection that the tax is not for a county purpose, and has been already considered.

But the further objection is made that the county is not a municipal corporation, within the meaning of section 3055, and therefore cannot be sued for the tax, although it were levied and collected for its use and benefit, by its own board of commissioners and collector, and actually paid over to it and used by it. Section 3054, providing for actions to enjoin the illegal levy of taxes and assessments, does not contain the word "municipal." But, in case of a proposed levy for the use and benefit of a corporation the action to enjoin the levy must be brought against such corporation, and, if the levy would go upon the tax-list, the county treasurer must be joined in the action. There is no question that a county is a corporation. Then, by the theory of defendant in error, we have this state of affairs: A county about to make an illegal levy of taxes for its own use and benefit may be restrained from doing so at the suit of the tax-payer. But if the taxpayer, through absence, ignorance, or any cause or necessity whatever, fails to enjoin the levy, and the money is collected and paid over to the county, it can never be recovered back, though extorted by

the illegal exercise of the taxing power, and received by the county, and used by it. But the remedy of the tax-payer, when thus despoiled by the county through the exercise of its governmental powers of taxation, is not against the county, which has got his money, but against the collector, who has not got it; or against his personal representative, who has not got it, and perhaps never saw it or heard of it. And it will not do to say that the county must reimburse the collector or his personal representative. If the county, being a municipal corporation, cannot be sued for the recovery of the illegal tax, then none of these parties can have any remedy against the county. The primary sufferer—the taxpayer who has been robbed—must recover his money of the collector, if he can. Then the collector becomes the sufferer. If the tax-payer fails to recover, he is still the sufferer himself. And in either event the county is wrongfully the gainer, profiting by the calamity which it has itself inflicted upon one or the other of its citizens. I cannot think that this is what our legislators intended when they enacted the sections under consideration, and enacted further that they should be liberally construed, in order to promote their object and assist the parties in obtaining justice. It seems to me that the proposed construction tends to the perpetration of injustice, surely cruel, and it may be monstrous, and that continually. And where is the necessity for this construction, which, in justice and moderation, must be characterized as not only harsh, but calamitous? Is it true that, while a county is a public and political corporation, or, in the language of the statute, a body politic and corporate, it may not be also a municipal corporation? That the words "municipal corporations" cannot be used to include counties in their meaning? It is evident that this question is largely one of authority. Abbott's definition of a "municipal corporation" is: "A term embracing that class of corporations which are created to administer local government, subordinate to the general sovereignty of the state or kingdom. It includes boroughs, cities, incorporated towns and villages, and some other forms of public corporations." Abb. Law Dict. There is nothing in this definition to exclude counties. They are "corporations created to administer local government, subordinate to the general sovereignty of the state." Angell & Ames say: "The word 'corporation' is, we know, oftentimes significant of a community clothed with extensive civil authority; and a community of that kind is sometimes called a 'political,' sometimes a 'municipal,' and sometimes a 'public' corporation." Ang. & A. Corp. § 14. Bouvier defines a "municipal corporation" thus: "A public corporation, created by governments for political purposes, and having subordinate and local powers of legislation; e. g., a county, town, city," etc. Bouv. Law Dict. Black, in his recent Law Dictionary, defines a "municipal corporation" as "a public corporation, created by government for political purposes, and having subordinate and local powers of legislation; e. g., a county, town, city," etc. Dill. Mun. Corp. § 20, after some general remarks on the subject of corporations and municipal corporations, says: "We may therefore define a 'municipal corporation,' in its historical and strict sense, to be the incorporation by the authority of the government of the inhabitants of a particular place or district, and authorizing them, in their corporate capacity, to exercise subordinate, specified powers of legislation and regulation with respect to their local and internal concerns." So far, this description may well include counties. Abbott's definition specifies counties as having these subordinate and local powers of legislation. But Dillon distinguishes between counties and municipal corporations proper, as he terms them, thus: "Sec. 22. Corporations intended to assist in the conduct of local civil government are sometimes styled 'political,' sometimes 'public,' sometimes 'civil,' and sometimes 'municipal,' and certain kinds of them, with very restricted powers, 'quasi' corporations,—all these by way of distinction from 'private' corporations. All corporations intended as agencies in the administration of civil government are public, as distinguished from private, corporations. Thus an incorporated school-district or county, as well as city, is a public corporation; but the school-district or county, properly speaking, is not, while the city is, a municipal corporation." In section 10 he refers to road-districts, school-districts, and counties, as well as to cities and towns, as "our municipal institutions." And in section 23 he quotes from the case of Hamilton Co. v. Mighels, 7 Ohio St. 109, confirming the distinction between municipal

corporations proper and *quasi* corporations, such as counties. In this quotation the court calls a county a "municipal organization."

There is a numerous line of decisions to the effect that counties are municipal corporations. One Iowa case goes to the extent of saying that the expression has never been construed otherwise. Land Co. v. Carroll Co., 39 Iowa, 166. The supreme court of the United States continually includes counties with municipal corporations. On the other hand, there are a number of decisions of state courts holding the reverse. In the case of State v. Leffingwell, 54 Mo. 465, the opinion treats learnedly of the meaning of the word "municipal." I quote: "We thus perceive that there are not only two classes of public civil corporations, but the word 'municipal' has a double meaning,—one a narrow, confined meaning, as relating to a *municipium*, or free town, or, as we should say in the present age, relating to towns, cities, and villages; and another broader and more usual signification, relating to the state or nation. And therefore, while the words 'municipal corporations' have a well-defined meaning, and embrace cities, towns, and villages, and nothing more, the words are not equivalent at all to those other words, 'for municipal purposes.' The latter embrace, by the common speech of men, before and since the days of Blackstone, state or national purposes. And therefore, while municipal corporations are for municipal purposes, there are other corporations for municipal purposes that are not strictly municipal corporations." To this it may well be added that before and ever since the time when the celebrated decree went out from Cæsar Augustus that all the world should be taxed, (meaning enrolled;) and when Joseph, also, went up from Galilee, out of the city of Nazareth, into Judea, unto the city of David, which is called Bethlehem, (because he was of the house and lineage of David,) to be taxed, with Mary, his espoused wife,—the word "*municipium*," and its derivatives, "municipal" and "municipality," have been used to indicate not only urban districts, but rural districts as well. And never was the governmental power implied in the word "*municipium*" necessarily confined in its operation to the *urbs* or city proper. *Municipium* has been freely translated "a free city," referring to the time of the Roman domination, when the free city was the exception. While Rome was extending her empire by force of arms, when it was said of her that she had conquered a city, it often meant that she had subjugated a tribe or a nation, and had added to her dominions a province. And when, in her early history, it was said she had founded a city, it meant she had established a colony. And if she permitted the residents of the conquered or newly-settled country to exercise some governmental powers, and hold some of the offices, then their city, with as much surrounding country as they could hold with the strong hand against neighboring tribes and powers, became a *municipium*, invested with some powers of local government and home rule, but always subject to the supreme authority at Rome. Thus it is in entire accordance with the original and early use of the word "*municipium*" and its derivatives that they should apply to state or national matters, as the Missouri court says, and that municipal law should be, as Blackstone teaches, the law of a state or a nation, as distinguished from international law, and should include, as it does, the entire internal polity or system of administration of a state or government. And how, in that system of administration, a subordinate public and political corporation, performing governmental functions to the extent of its territorial boundaries, can be a "municipal institution," in the language of Dillon, or a "municipal organization," in the language of the supreme court of Ohio, and not be, at the same time, and in the same sense, a "municipal corporation" as well, I leave for those who are skilled in polemics to discuss. It is beyond my capacity. The problem is to explain how the municipal character can attach to the corporation as an institution or as an organization, and not attach to it as a corporation as well. At the same time it is perfectly competent for any legislature or any author to use the words in their restricted sense, as including only incorporated cities and villages. This is what Judge Dillon has done, it seems, chiefly for convenience of classification or limitation in treating the subject. He says: "The phrase 'municipal corporations,' in the contemplation of this treatise, has reference to incorporated villages, towns, and cities, as distinguished from other public corporations, such as counties, and *quasi* corporations." Dill. Mun. Corp. § 22. Under the able leadership of

Dillon this use of the phrase is evidently increasing. It is adopted in the constitution of the state of California, and her courts hold, in consequence, that in her laws this use is to be understood, unless the contrary meaning appears. The same is true of some other states. Our own constitution makes this distinction by providing in one article for the organization of counties and in another for municipal corporations. The phrase, however, has always been a convenient one, in its more general sense, as indicating all corporations exercising governmental and local functions; and we have no other word to take the place of "municipal" in this use of the word. "Public" will not do. Some public corporations exercise no governmental functions. "Political" is not appropriate. "Civil" is still further off. The result is, if we use the words "municipal corporations" in either sense, we must explain which, as Dillon has done, in order to be understood. And when we find the words in any statute law, or in any treatise, where it is not defined, we must determine the meaning by the connection. And the words in their more enlarged application, including counties, townships, school-districts, road-districts, etc., are so convenient in use that they can hardly be dispensed with, and people will not dispense with that use of them, and statute law cannot abolish it. And the word "municipal," in this and similar connections, as signifying governmental and local, cannot be spared. Even such astute authorities as Judge Dillon and the Ohio supreme court will make this use of the word "municipal," even while protesting against it. Judge Cooley devotes a long chapter to "the several grades of municipal governments," treating thereunder of incorporated cities and villages, and of counties, towns, (townships,) school-districts, and road-districts; and he continually uses the phrases "municipalities," "municipal organizations," and "municipal corporations," to include all these governmental agencies. Cooley, Const. Lim. 224–312. The same thing may be observed of law-writers generally. There never was a time when these words were not used in this sense, and this is probably what the Iowa court meant in saying they had never been construed in any other. It is evident that either use of the words is proper, and sustained by good authority. And which use is meant in any given case must be determined by the connected language and subject-matter.

Then let us examine sections 3054 and 3055 a little further. These sections are intimately connected, similar in language, and must be construed together. They are parts of one scheme to prevent and remedy illegal taxation. The proviso to section 3055 reads: "Provided, that when the money derived from said taxes or assessments has been actually paid over to any municipal corporation, for whose use and benefit it was levied or collected, then an action shall be brought against said municipal corporation to recover said taxes or assessments." Let us consider further in this connection the claim of defendant in error that, admitting the county to be a municipal corporation, it cannot be sued, under this proviso, for the two-mill school tax, because this tax was not levied or collected for the use and benefit of the county, but was levied and collected for the use and benefit of the school-districts. If this last proposition is correct under section 3055, it must also be correct under section 3054. Let us not forget the language: "Sec. 3054. Actions to enjoin the illegal levy of taxes must be brought against the corporation or person for whose use and benefit the levy is made; and, if the levy would go upon the tax-list, the county treasurer must be joined in the action." Corporations may be sued under this section, whether they are municipal corporations or not; and school-districts are admitted to be corporations. They are expressly made so by statute. Then, according to the position of defendant in error, if plaintiff in error, or any other tax-payer, had proceeded to enjoin this alleged illegal levy, he would have been compelled to sue every school-district in the county, joining the county treasurer, in order to enjoin the levy of the two-mill school tax. What actions he should have brought to enjoin the levy of the other taxes alleged to be illegal defendant in error does not discuss. But, further, suppose actions in this or any other case where the levy of the county school tax is claimed to be illegal to be brought against all the school-districts in the county, joining the county treasurer, and suppose the school-districts all brought into court by proper processes to answer petitions for perpetual injunctions restraining them all from levying a tax for the support of the common schools in the county. What would their answers be? Would

they not say: "We are not making or procuring any levy of any tax for the support of the common schools of the county, and could not if we wished to. It is all that we can do to look after the schools within our respective boundaries. The tax you complain about rests in the discretion of the board of county commissioners to levy or not to levy. We have not the means of knowing what their action will be, or of preventing it if we knew, and knew it to be illegal; and we don't think you have. And we think your sworn petition must have been verified, and your affidavit for an injunction must have been made at a venture." Or suppose, by default or otherwise, injunctions against the school-districts and county treasurer should be ordered and made perpetual, restraining them from making or procuring any levy, what possible effect could that have on the action of the board of county commissioners as to the levy of the county tax for the support of the common schools in their county? Neither school-districts nor the county treasurer could control the action of the board in this particular if they tried. The law gives the county commissioners authority to levy this tax, and no school-district or county treasurer has anything to say about it. Should the board proceed to levy a tax excessive or otherwise illegal, the school-districts cannot prevent it. The suits against them, and the injunctions running against them and the county treasurer, are simply nugatory and useless. What a succession of calamities, unforeseen and numberless, follows the single error of eating the forbidden fruit! What a succession of absurdities follow in the train of a single error in the construction of a statute! All these absurd consequences follow from the single error of calling a county tax for the support of the common schools in the county a school-district tax, or a tax for the use and benefit of the school-districts. And, besides, we have been told of the hardship of compelling the tax-payer to bring suits against each school-district in the county for the recovery of the illegal exaction after it had been distributed. This is a menacing phantom, but shadowy, conjured up in the gloomy atmosphere of the same error; an error that was laid to rest by the decision in the case of Moore v. County Com'rs, supra, and now for the first time resurrected. There is no school-district tax in question. School-district taxes can be au-

thorized only by the vote of the electors of a district. They need not be the same in different districts, and seldom are. But this has nothing to do with the tax not exceeding three mills on the dollar, authorized by the sixth subdivision of section 3768 of the Revised Statutes. This is a county tax, levied and collected by the county, for its own use and benefit, and used by it in the discharge of its own obligation, created and imposed by the law, to do something for the support of the common schools in the county; as legitimate a purpose of county taxation as poor and lunatic, roads and bridges, or district courts.

It is argued that it is the policy of the law to give to the tax-payer a simple and effective remedy to recover back the illegal tax in a single action against the collector. I agree that it is the policy of the law to give the tax-payer a simple and effective remedy, but not necessarily against the collector. It is the policy and declared purpose of the law that the illegal tax should be recovered back; not that the collector should be mulcted in damages after the tax is out of his reach. To recover back the tax the suit must reach it where it is, not grope for it where it is not, nor yet seize upon some substitute for it, and declare that the substitute is the tax itself. When the county has received the tax, how can a judgment against the collector or his personal representative be a recovery of the tax? What is such judgment, more than damages against the collector and in favor of the tax-payer? It may be said that the collector would have a right to recoup from other funds in his hands. However this may be, and it is extremely doubtful, to say the least, the fact stares us in the face that he may go out of office without the necessary funds. He cannot withhold a fund to await contingencies. He is obliged continually to pay out money collected for taxes according to law. He may die without funds, and leave to his personal representative a ruinous burden, and without hope of relief, according to the theory of defendant in error, that a county cannot be sued to recover back illegal taxes, but that the collector and his personal representative only are liable. It is the policy of the law to do justice to the tax-payer, but not by doing injustice to some one else. There is evidently a settled policy to do simple justice to all concerned. There is no just or plausible

reason why a county collector should be held liable for the amount of an illegal tax honestly, though it may be mistakenly, collected by him, and paid over to the county, and used by it, and which he may never be able to recover back. There is no reason why an incorporated city or village should be held to pay back an illegal exaction, effected in the name of the taxing power, that does not apply with equal force in the case of a county. The proviso to section 3055 shows a policy to do simple justice, by releasing the collector and his personal representative from the burden of a lawsuit, with prospective damages, when, in the apparent discharge of an imperative duty under the law, the collector has collected and paid over money, and by holding liable the municipal corporation which has received and used the money to which it was not entitled. Simple justice and the clear policy of the law require the application of the same rule to all corporations exercising the governmental function of taxation within their territorial limits, and that the phrase "municipal corporations" should be construed accordingly. This is simple justice. If it be a liberal construction of the phrase, the law requires a liberal construction to be given when necessary to enable the parties to obtain justice. But it is really a construction according to the evident intent and purpose of the law, rather than a liberal construction. No word is construed out of its usual, well-established meaning. But it is claimed that, the treasurer being collector, as soon as the tax is collected, it is, in effect, paid over to the county; and, if the county is liable to suit for the money as soon as collected, it renders of no effect the provision of the law that the collector or his personal representative may be sued for it. As to the county taxes, as our statute stands at present, this is true; and it is a matter of congratulation that it is true. It would be more in accordance with simple justice if it were true of all taxes, and at all times, and that the person or corporation beneficially interested should always bear the burden of the litigation, premising simply that the collector has acted in good faith. But prior to 1882 the sheriff was county collector. We know not how soon the collection of the county taxes may be taken from the treasurer, and given to some other officer; but this consideration applies only to county taxes. The county collector is also collector of state taxes

and school-district taxes, as our laws now stand, and may be constituted collector of other taxes by any legislature. State and territorial taxes are and have been controlled by considerations entirely distinct from those governing county taxes, and not necessary to discuss now. This leaves the school-district tax the only other tax collected by the county collector. This tax can be authorized only by vote of the electors of the district. The county commissioners are said to make the levy, but they have absolutely no discretion as to the amount. They merely make an arithmetical calculation from *data* furnished. Their problem is to ascertain and declare how many mills on the dollar of the assessed value of the taxable property of the district will be necessary to raise the amount of the tax voted. After the tax is collected, and while it is in the hands of the collector, there seems to be no question that he may be sued for it if it is claimed that it is illegal. But by the theory of defendant in error the collector is liable to such suit after the money is paid over to the school-district, and out of his reach. And a school-district taking the necessary steps to procure the levy of a tax for its own use and benefit may be enjoined, if it is claimed such proceedings or such tax would be illegal; but if this is not done, and the district once gets the money, it can never be recovered back, but the innocent collector or his innocent personal representative must stand the loss, and repay the tax-payers. So, according to the contention of defendant in error, the county cannot be sued for county taxes illegally exacted, nor the school-district for school-district taxes illegally exacted, after they have been received by the county or school-district, as the case may be, because neither school-district nor county is a municipal corporation, within the meaning of the statute. Then the tax-payer is necessarily confined to his action against the collector. If, as is usually the case, the tax-list is regular on its face, and the common-law rule prevails that such a tax-list protects the collector, then the tax-payer loses his money without remedy. But if it should be held that the common-law rule is abrogated by the statute, and the collector liable, then the collector or his personal representative loses his money, without remedy; and the county or the school-district, as the case may be, becomes the beneficiary and *particeps criminis* in a swindle or rather in a down-

Powder River Cattle Co. v. Board of County Com'rs.

right robbery, perpetrated under pretense of taxation, and enforced by the strong arm of the law. If this is the result to which our successivo legislatures have attained in the cause of justice, they have toiled to little purpose.

Sections 3054 and 3055 provide relief against illegal taxes and assessments by actions to enjoin their levy and collection, and to recover them back when collected. The provisions of these two sections are general in their nature. They affect principally the remedy. They do not purport to define what is an illegal tax or assessment, or an illegal levy or collection. They may be considered, however, as affecting, incidentally, the right of action itself, in specifying the state of facts under which an existing right of action shall be available against certain persons or corporations. There is a section occurring in our revenue law applying only to counties, and directly affecting and enlarging their liability. It reads: "Sec. 3821. In all cases where any person shall pay any tax, or any portion thereof, that shall thereafter be found to be erroneous or illegal, whether the same be owing to clerical errors or other errors, the board of county commissioners shall direct the treasurer to refund the same to the taxpayer; or, in case any real property subject to taxation shall be sold for payment of any such erroneous tax, the error in tax may at any time be corrected as above provided, and shall not affect the validity of the sale, but such property shall be redeemed by the county as hereinafter set forth." This section is special to counties. Section 3055 is in entire harmony with it. They both contemplate that a county which has exacted and received an illegal tax shall restore it. Section 3055 makes the application of the same principle more general, and evidently includes in its scope all municipal corporations, not in the widest sense of the phrase, as including national or state governments, or in its narrowest and most restricted sense, as including only incorporated cities and villages, but, in the time-honored and popular use of the phrase, including the county itself and all local public corporations within it, which exercise local and governmental functions.

It is urged that it is necessary for plaintiff to show payment under duress and under protest, and that this has not been done. A number of well-considered cases hold that what is set up in the petitions

in this case is sufficient to constitute duress, and that protest is not necessary. But section 3821 dispenses with all considerations of compulsion and protest. All that is necessary is that the tax paid shall thereafter be found to be erroneous or illegal. If the county commissioners so find, it is their duty to direct the treasurer to refund the tax. But it would destroy the effect of the provision, and all uniformity in its meaning and application, to leave this finding to the absolute discretion of the commissioners. Such finding may be by the judgment of a court of competent jurisdiction, as the result of an action.

It is urged that the petitions do not show a proper demand. It is questionable whether a demand is necessary under the established Wyoming practice. Under a similar statute in Iowa demand was held merely to affect the question of costs. However this may be, demand is alleged in the petitions in general terms. This is sufficient on demurrer.

I conclude:

1. That the county taxes in question are excessive and illegal.

2. That the county of Johnson is a municipal corporation, within the meaning of section 3055 of the Revised Statutes of Wyoming.

3. That this action is properly brought against the board of the county commissioners of the county of Johnson.

4. That the trial court erred in sustaining the demurrer.

5. That the judgment should be reversed, and the demurrer overruled, and the cause remanded for further proceedings.

### ON REHEARING.

(October 11, 1892.)

Groesbeck, C. J. The motion for a rehearing of this case was submitted on argument and briefs at the last term of this court, and we have considered it is to the main point involved, as to whether the county in its corporate capacity, the board of county commissioners, or the collector of taxes, should be sued in an action to recover back alleged illegal taxes. It is unnecessary to discuss this point, as it was again reviewed in the case of Board Com'rs v. Searight Cattle Co., 31 Pac. Rep. 268, (decided at this term,) post, 777. We adhere to the opinion rendered on this case on the original hearing on this point, and hold that the tax collector, and not the

Graham v. Culver.

county, must be sued in such an action as this.

As to the other point decided, as to whether or not the general school tax levied by the county board, and collected uniformly from all the property in the county, but apportioned to the several school districts in the county, is a county purpose, we still adhere to the opinion expressed that it is not. No action would lie against the county, if it could be sued, to recover such taxes, as they are not levied or collected for the use and benefit of the county or actually paid over to it, and never pass into the control of the county in its corporate capacity. They constitute no part of the county funds subject to the order of the board of county commissioners, and could not be refunded to the taxpayer by such board. They are apportioned to the school districts in the county by the county superintendent of schools, and are paid to the treasurers of the several school districts of the county, upon orders drawn for that purpose upon the county treasurer. In no case and at no time do they constitute a fund subject to the action of the county board, by whom the county funds are disbursed, and by whom the powers of the county as a body politic and corporate are exercised. This general school tax is not levied for a county purpose, within the meaning of the statute fixing a limitation to the levy for territorial and county purposes. The motion for a rehearing is denied.

MERRELL, J., concurs. CONAWAY, J., dissents.